[No. B127270. Second Dist., Div. Three. Feb. 16, 1999.]

CHRISTINE M. et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Real Party in Interest.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, it is ordered that the opinion be partially published and the following portions be deleted from the published version: parts 2 and 3 of the Discussion.

**COUNSEL**

Kathy Post Klein for Petitioner Christine M.

Stuart L. Tolchin for Petitioner Eusebio V.

No appearance for Respondent.

Lloyd W. Pellman, County Counsel; Auxiliary Legal Services, Judith A. German and Jill Regal for Real Party in Interest.

**OPINION**

**KLEIN, P. J.**—Petitioners Eusebio V. (father) and Christine M. (mother) seek writ review (Welf. & Inst. Code, § 366.26, subd. (*l*);[1] Cal. Rules of Court, rule 39.1B) of respondent court's order terminating family reunification services and setting a hearing under section 366.26 as to minor Diana M. on March 15, 1999. We deny the writ.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Proceedings through disposition.*

The minor was declared a ward of the court pursuant to section 300 based on a petition filed February 14, 1997. As sustained, the petition alleged: the minor had been born with a positive toxicological screen for methamphetamines; minor's sibling Nora A. had been born with a positive toxicological screen for methamphetamines; mother is a frequent user of methamphetamines; and father is presently unable to care for the minor.

The Los Angeles County Department of Children and Family Services (DCFS) filed an application for petition on February 13, 1997, which indicated mother denied "a drug problem and denies she was using any drugs when the [minor] was born." The report noted mother previously had been offered services after Nora A.'s drug-exposed birth in 1995. Mother agreed

---

[1]Subsequent unspecified statutory references are to the Welfare and Institutions Code.

at that time to participate in a drug treatment program, complete a parenting class and submit to random drug testing but mother did not cooperate. "DCFS was unable to locate [mother] and her children until [mother] gave birth to . . . Diana."

The juvenile court ordered the minor detained and, on March 5, 1997, granted DCFS's request for placement of the minor and the minor's half sibling, Angeleena E., with the maternal great aunt.[2]

DCFS's reports indicated the children's social worker (CSW) had commenced a due diligence search for father in July of 1997, and met with father on August 1, 1997. In that meeting, father told the CSW he had enlisted in the Navy and would leave for training on August 25, 1997. Father stated he was unable to care for the minor and, if mother was unable to provide for the minor, father wished the minor placed with the paternal uncle and aunt who already had adopted minor's sibling, Nora A. Father gave the CSW the paternal uncle's address on Adriatic Boulevard in Long Beach as father's mailing address.

A DCFS report filed August 28, 1997 indicated the CSW had visited mother at Twin Towers jail on August 25, 1997. Mother had attended 12 three-hour drug education classes at La Puente Unified School District Correctional Education Division and one parenting class at Hacienda La Puente Unified School District. Mother indicated she wished to enter drug treatment in Victorville after her anticipated release from custody on August 29, 1997.

On August 28, 1997, the juvenile court appointed counsel to represent father and granted DCFS's request for a continuance to file a first amended petition. However, a report prepared for September 22, 1997, recommended against filing an amended petition as to father because "he has no interest in parenting minor Diana."

DCFS reported that mother had been released from jail on September 18, 1997, and had telephoned the CSW jointly with father the following day. Mother told the CSW she planned to attend Alpha Lots Inpatient Program in Victorville. Father advised he intended to enter the Navy on September 22, 1997, "he does not want [the minor] adopted, but wants to raise the child along with the mother." A report prepared for September 29, 1997, recommended that father obtain counseling to clarify his desire to parent the minor. On September 29, 1997, the juvenile court declared the minor a ward of the court, ordered mother to attend parenting class, and drug counseling

---

[2]Neither Nora A. nor Angeleena E. is a party to this writ proceedings.

and to undergo random drug testing, and ordered father to attend an approved program of parent education.

## 2. *Implementation of the case plan.*

A report prepared for March 30, 1998, indicated the minor suffered from asthma and needed numerous breathing treatments each day. The CSW had met with mother on September 25, 1997, and October 9, 1997, and provided referrals on both dates. The CSW also sent mother contact letters on November 25, 1997, December 26, 1997, January 27, 1998, and February 15, 1998. The CSW then discovered mother had been arrested for forgery and was due to be released from Twin Towers on June 2, 1998. Regarding father, the report indicated father's relatives reported father was in the Navy and had been stationed in Virginia for the next three years. The CSW sent contact letters to father at paternal uncle's address on November 25, 1997, December 26, 1997, January 27, 1998, and March 18, 1998. On March 20, 1998, the paternal aunt advised the CSW that father could not attend the next hearing because father was at sea for six months. The paternal aunt also reported father had been in town one day during the previous week and had visited the minor but that "father is unable to call or visit with CSW due to his circumstances."

A CSW's report filed April 27, 1998, indicated mother had been moved from Twin Towers to the Metropolitan State Hospital on a voluntary basis and had been prescribed Novane after mother expressed suicidal ideation. A hospital social worker advised the CSW the hospital did not offer drug treatment or parenting classes but noted mother had attended the group sessions. Mother expressed a desire to enter residential drug rehabilitation upon release. An adoption assessment attached to the report indicated Diana had been in the custody of the maternal great aunt since birth. Minor does not sleep through the night, can be very aggressive, and "tantrums when she doesn't get her way." The minor had been hospitalized two or three times due to her asthmatic condition but eats well and is very affectionate.

On April 27, 1998, the juvenile court denied father's request for a stay of the proceedings, found reasonable efforts had been made with respect to father, but had not been made as to mother, and continued the matter for further review.

The permanency planning report prepared for August 18, 1998, indicated the newly assigned CSW had mailed mother contact letters to the Metropolitan State Hospital on April 30, 1998, and May 26, 1998, to inform mother of the juvenile court's orders and the new CSW's telephone number, but the

letters had been returned undelivered and the CSW had no forwarding address for mother. Mother telephoned the CSW on June 4, 1998, and said she had been released from Metropolitan State Hospital two weeks earlier. The CSW met with mother at the maternal grandmother's home in Victorville. The CSW also arranged to drive to Apple Valley to meet mother on June 9, 1998, at the home of the maternal great aunt. However, the CSW could not contact mother to confirm the meeting and the maternal great aunt advised the CSW that mother had moved to Los Angeles. The CSW met with mother, the maternal great aunt and the minor on June 29, 1998. Mother was unsure where she would reside. The CSW gave mother referrals for San Bernardino and Los Angeles Counties.

On July 6, 1998, the CSW received a telephone call from the maternal great aunt indicating mother had been hospitalized for two days after suffering what appeared to be an anxiety attack. On July 30, 1998, the CSW visited the maternal great aunt in Apple Valley. The maternal great aunt had not seen mother in approximately two weeks and thought mother "was out back in the streets." The maternal great aunt stated mother was "very depressed and suicidal" and the incident the maternal great aunt had referred to as an anxiety attack had actually been a suicide attempt which occurred during one of mother's visits with the minor. Mother had consumed four bottles of medication, became disoriented and started to foam at the mouth. The CSW attempted to locate mother's last known address on Adams Street in Long Beach on July 31, 1998, but the address given by mother did not exist. Mother visited the minor two or three times a week after her release from Metropolitan State Hospital. The maternal great aunt monitored the visits.

The report noted father continued in the United States Navy with the same mailing address and that father had advised the CSW the minor would enjoy military benefits if she were placed with the paternal uncle and aunt. The paternal aunt telephoned the CSW, expressed willingness to adopt the minor and requested visitation, but thereafter did not contact the CSW.

The CSW informed father of the relevant court orders in contact letters sent to his mailing address on May 26, 1998, June 29, 1998, and August 11, 1998. Father failed to contact the CSW after May 5, 1998. The CSW attempted to contact children's social services in Virginia on June 11, June 17, and July 13, 1998 but the CSW's messages were not returned. The CSW also attempted to locate father through directory assistance and a locator number. The paternal aunt advised that father was going to be at sea for six months. The report concluded neither parent had complied with the case plan and recommended adoption of the minor.

On October 2, 1998, DCFS filed a supplemental petition under section 387 which indicated that on September 30, 1998, the CSW had gone to the home of the maternal great aunt and found the minor in the care of a nine-year-old minor. On October 5, 1998, the juvenile court ordered the minor to remain in the home of the maternal great aunt and admonished the maternal great aunt not to leave the minor alone without adult supervision. The matter was continued for a contested hearing.

A case plan update prepared for November 16, 1998, in connection with the supplemental petition indicated the maternal great aunt had hired a woman to assist her with the minors in her care. The maternal great aunt had experienced chest pains on the day she left the minor alone and did not want to take the minor with her because maternal great aunt was ill. The case plan update indicated mother's whereabouts had continued to be unknown until the maternal great aunt informed the CSW that mother was in custody at Twin Towers Women's jail. Mother had not completed any court ordered programs. The CSW visited mother at Twin Towers on November 10, 1998. Mother reported she was working in the kitchen, and was attending parenting class and substance abuse class.

3. *The contested hearing under section 366.22.*

On November 16, 1998, the juvenile court denied father's renewed request for a stay, received various DCFS reports into evidence, and conducted a contested hearing under section 366.22. CSW Sandra Gonzalez testified she had been assigned to this case on April 15, 1997. In July of 1997, mother provided Gonzalez proof of attendance at one parenting class and 12 three-hour substance abuse classes. The CSW was advised Twin Towers offered parenting classes and drug treatment programs on a daily basis but did not determine what services were available at the Metropolitan State Hospital. The CSW indicated mother had visited with the minor frequently after mother was released from custody, and that the maternal great aunt had taken the minor to see mother at Twin Towers on one occasion. The CSW noted the maternal great aunt resided in Apple Valley and Twin Towers is in downtown Los Angeles. Gonzalez conceded she had never inquired if the maternal great aunt would be willing to take the minor to visit mother more frequently.

Gonzalez advised father on May 5, 1998, of his obligation to attend parenting class. Gonzalez recounted her efforts to learn what services were available to father in Virginia and through the Navy. Father advised the CSW "it was almost impossible for him to attend parenting [class] since he's at sea." Gonzalez testified she was unaware that father had ever visited the

minor and the maternal great aunt had informed the CSW that father did not write or telephone to inquire about the minor. Gonzalez conceded that father may have visited the minor when the minor was in the custody of paternal aunt for approximately one month in 1997, and that father maintained contact with the paternal aunt.

Mother testified she had attended "a few more" parenting classes than the one referred to by the CSW and may have attended as many as five. Mother testified that during her first incarceration at Twin Towers, parenting classes were offered once a week on Tuesday. "They [would] announce it, and it's—I would attend and I wouldn't." In 1997, mother attended 12 of 14 required substance abuse classes and would have received a certificate but she was released from custody before she could attend the last 2 meetings. During her most recent incarceration, mother lost her personal papers, she was in a working dorm of the jail, and mother's work conflicted with the parenting class. Nonetheless, mother attended four substance abuse classes and one parenting class. Mother testified she currently was scheduled for release from jail on January 10, 1999. Mother stated she intended never to use drugs again and to enter a residential drug treatment program in Long Beach. Mother claimed she telephoned the minor frequently after the maternal great aunt brought the minor to visit. While mother was out of custody, mother's probation officer could have tested mother for drugs and mother attended a substance abuse class. Mother indicated she had been returned to jail for a probation violation in which drugs were found in mother's phone book.

After hearing argument, the juvenile court found neither parent had complied with the case plan and, by clear and convincing evidence, that reasonable family reunification services had been offered mother and father. Regarding mother, the juvenile court stated mother had "done next to nothing. Any substance abuse classes she may have taken in her first incarceration . . . are negated by the mother's subsequent parole violation on a drug charge. Mother obviously has not cleaned up her act." The juvenile court noted mother had failed to comply with the case plan and had failed to keep the CSW informed of mother's whereabouts while mother had been released from custody. The juvenile court found the CSW "made extreme efforts in trying to locate the mother, give her referrals, and [mother] did" nothing. Regarding father, the juvenile court found he had shown no interest in the minor.

The juvenile court dismissed the supplemental petition and denied a request for placement of the minor with the paternal uncle and aunt, but directed the "relatives to arrange for sibling visitation." The juvenile court

indicated it would not be appropriate to remove the minor from the only home the minor had ever known simply to place the minor with other relatives. The juvenile court terminated family reunification services as to mother and father, and set the matter for a hearing under section 366.26 on March 15, 1999.

## CONTENTIONS

Father contends the juvenile court improperly denied his timely request for a stay of the proceedings pursuant to the Soldiers' and Sailors' Civil Relief Act (50 U.S.C. Appen. § 501 et seq.), and DCFS failed to provide family reunification services.

Mother contends DCFS did not provide reasonable family reunification services, the case plan was not sufficiently tailored to meet mother's needs as an incarcerated parent, and the trial court improperly prevented questioning of the CSW related to the sufficiency of the family reunification services provided mother.

## DISCUSSION

1. *The record supports the juvenile court's denial of father's request to stay the proceedings.*

 a. *Background.*

Father's whereabouts at the time the minor was detained were unknown. The CSW initiated a due diligence search for father on July 10, 1997, and met with father on August 1, 1997. In that meeting, father told the CSW he had enlisted in the Navy and would leave for training on August 25, 1997. Father stated he was unable to care for the minor and, if mother was unable to provide for the minor, father wished the minor placed with the paternal uncle and aunt who already had adopted minor's sibling, Nora A.

On August 28, 1997, the juvenile court appointed counsel to represent father's interests. On April 14, 1998, father's counsel filed a written request to stay the proceedings pursuant to the Soldiers' and Sailors' Civil Relief Act (50 U.S.C. Appen. § 501 et seq.).[3] The motion asserted father's attendance in "the armed forces away at sea makes it impossible [for father] to

---

[3]Title 50 United States Code Appendix section 521 provides an action shall be stayed upon motion of a serviceman or servicewoman during his or her period of military service "unless, in the opinion of the court, the ability of plaintiff to prosecute the action or the defendant to conduct [a] defense is not materially affected by reason of [said] military service."

comply with any reunification order that he attend a parenting class." Father's counsel requested a tolling of the family reunification period until father returned from sea. DCFS filed a written response to the request in which it asserted father had failed to demonstrate his defense of the proceedings would be adversely affected by reason of his military service. (*Hackman v. Postel* (N.D.Ill. 1988) 675 F.Supp. 1132.)

The juvenile court denied the requested stay on April 27, 1998. The reporter's transcript before this court does not include the proceedings on that date. However, at the outset of the contested section 366.22 hearing, father's counsel asked the juvenile court to reconsider its earlier denial of the request. Counsel indicated father was in the Persian Gulf and "certainly unavailable to come to these proceedings. [¶] He's made his wishes known. And I'm not saying that the proceeding should be stayed, but what I am asking for is that no permanent disposition, no permanent court order be made in any way permanently affecting the father because he has been unable to" attend a parenting class which is the only order the court had made as to father. The juvenile court indicated it did not intend to address the matter of a stay again, and that the juvenile court would consider father's wishes regarding placement of the minor but that placement was not an issue at a hearing under section 366.22.

Nonetheless, at the close of the contested hearing under section 366.22, at the time the juvenile court made the findings required by law, the juvenile court noted it previously had denied the request for a stay. The juvenile court recalled: "At that time I was told [father] had [had] no contact with his attorney, very little with the social worker, none with [the minor], none with [the minor's] caretaker. [¶] To deprive [the minor] of a permanent plan simply because father is at sea when he's shown no effort or interest in her, to be perfectly frank, I don't believe is . . . the law and certainly not the intent behind it. [¶] There is nothing keeping [father] from writing letters. It's difficult for me to believe that in the last year and a half he's had no leave, time to call, write, to visit. And frankly, it just shows an uninterested parent, and to extend further reunification to him is useless in this case. [¶] If he had shown some interest and simply couldn't comply because of his being at sea, that would be a completely different case. But he's shown no interest here."[4]

b. *Father's contention.*

 Father claims the evidence showed he could not attend the court-ordered parenting class because he was stationed at sea, and thus entitled to

---

[4]Although father has failed to provide this court a reporter's transcript of the hearing at which the juvenile court initially denied the request, we address the merits of father's claim because the juvenile court reprised its earlier ruling at the conclusion of the hearing under section 366.22.

a stay pursuant to the Soldiers' and Sailors' Civil Relief Act (50 U.S.C. Appen. § 501 et seq.). Father asserts *Hackman* v. *Postel, supra,* 657 F.Supp. 1132, the case the juvenile court relied upon, is distinguishable because father had no duty to defend this action. Additionally, father claims he did not have to demonstrate his defense of the action would be materially affected by reason of his military service because father had a right to services. Father argues the petition was sustained as to him only on the ground he presently was unable to care for the minor and father has conceded as much. Father requests placement of Diana with the paternal uncle and aunt who already have adopted Diana's sibling so that Diana might receive father's Navy benefits.

### c. *Resolution.*

No reversible error appears in the juvenile court's denial of the request for a stay.

■ "The Soldiers' and Sailors' Civil Relief Act . . . does not grant an absolute right to a stay whenever it is made to appear that one of the parties is in the military service. The act was passed to relieve those in the armed services from the strain of litigation during their period of service where the fact of their service would adversely affect their prosecution or a defense of a pending case. It was intended to prevent any advantage to the civilian litigant and disadvantage to the soldier or sailor litigant growing out of the fact that one of the litigants was in the military service." (*Johnson* v. *Johnson* (1943) 59 Cal.App.2d 375, 382 [139 P.2d 33].)

In enacting The Soldiers' and Sailors' Civil Relief Act, "Congress determined . . . the rights of all concerned . . . could . . . be best protected . . . by vesting a wide discretionary power in the trial courts of the nation . . . who, in each case, could determine whether the service man's rights would be adversely affected . . . . The Congress also determined that the rights of civilian litigants must also be considered. . . . However, in the national interest, wherever the rights of one in the military service will be adversely affected unless a stay is given, the court must grant a stay. . . . Doubtful cases should be resolved in favor of the service man." (*Johnson* v. *Johnson, supra,* 59 Cal.App.2d at p. 383.) The "act is to be always so liberally construed as to protect the active soldier and sailor . . . ." (*Culver* v. *Superior Court* (1954) 125 Cal.App.2d 76, 78 [270 P.2d 78].) An application for stay under the Soldiers' and Sailors' Civil Relief Act depends upon the facts and circumstances in each case. (*Runge* v. *Fleming* (N.D.Iowa 1960) 181 F.Supp. 224, 228.)

■ Here, although father made ambivalent statements about his desire to parent Diana with mother, and the CSW even suggested father attend

counseling to address the state of father's resolve on this point, at no time did father ever express any intent to parent the minor without mother. Father repeatedly indicated that, if mother and father could not obtain joint custody of the minor, father wished his relatives to have custody. Because mother was unable to overcome her drug addiction and assist father in the care of the minor, it was clear, based on father's own statements, that he could not parent the minor.

In addition to father's stated lack of desire to parent the minor without mother, the record discloses a lack of interest on the part of father in the well-being of the minor. At the time the juvenile court restated its basis for denying the requested stay, it noted father had failed to contact the attorney appointed to represent father's interest, had failed to contact the minor or the maternal great aunt, and had been in contact with the social worker assigned to this case only infrequently. Indeed, father's only personal contact with anyone involved in this case appears to consist of one face-to-face visit with the CSW and two telephone calls to the CSW. Father conducted all other contact with DCFS through his relatives. Regarding visitation of the minor, even construing the record in the light most favorable to father, it appears father may have visited the minor once when father was home on leave in March of 1998, and may have visited the minor when the minor was placed in the care of the paternal aunt in 1997 for approximately one month. Father has never appeared personally at any hearing of this matter and the written motion for a stay filed by father's counsel includes no declaration from father indicating how father's efforts to comply with the case plan, if any, had been impeded by his attendance in the military.

█ Regarding the last point, *Hackman*, the case cited by DCFS, is instructive. *Hackman* noted that cases construing the Soldiers' and Sailors' Civil Relief Act have required a showing by the party engaged in military service that he or she is actually unavailable to participate and that his or her rights would be adversely affected by virtue of absence from trial. "Courts denying motions for stays under § 521 have noted that mere contentions of unavailability, without affirmative representations that leave to attend the trial was sought by the serviceman and refused, are insufficient to warrant the imposition of such relief. [Citation.]" (*Hackman* v. *Postel, supra,* 675 F.Supp. at p. 1134.)

█ Although father assertedly was at sea at the time of the contested hearing under section 366.22, father failed to demonstrate how his military service had prevented him from complying with the order that he attended an approved parenting class. Thus, in addition to father's demonstrated lack of interest in the proceedings and lack of interest in the well-being of the

minor, father failed to demonstrate he was unable to comply with the case plan by reason of his attendance in the military and that a stay was needed to protect father's interests or to permit him to defend the action. The juvenile court expressly indicated a willingness to give father the benefit of the doubt and stated if "he had shown some interest and simply couldn't comply because of his being at sea, that would be a completely different case. But he's shown no interest here."

In sum, no abuse of the juvenile court's discretion appears. The mere fact father was in the Navy and stationed in Virginia, without more, was insufficient to warrant a stay of these proceedings. Balancing father's unasserted right to parent the minor against the minor's statutorily recognized interest in a stable placement, the juvenile court properly could conclude the only effect of the requested stay would be to postpone the minor's progress toward stable placement. Accordingly, the juvenile court properly could conclude "from the showing made . . . the defense would [not] be 'materially affected' by a denial of the continuance. [Citations.]" (*Ridley* v. *Young* (1944) 64 Cal.App.2d 503, 514 [149 P.2d 76].)

2., 3.*

· · · · · · · · · · · · · · · · · · · · · · ·

## DISPOSITION

The petition is denied.

Croskey, J., and Aldrich, J., concurred.

---

*See footnote, *ante*, page 1233.