170 Cal.App.4th 733 (2009)
In re A.R., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent,
v.
ROBERT R., Defendant and Appellant.
No. D053125.
Court of Appeals of California, Fourth District, Division One.
January 26, 2009.
*735 Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.
John J. Sansone, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.
Julie E. Braden, under appointment by the Court of Appeal, for Minor.

*736 OPINION
AARON, J.
Robert R. appeals following the dispositional hearing in the dependency case of his daughter, A.R. Robert contends that the juvenile court erred by refusing to stay the proceedings pursuant to the Servicemembers Civil Relief Act (SCRA) (50 U.S.C. Appen. §§ 501-596), and proceeding with the contested jurisdictional hearing. He also contends that the court abused its discretion by denying his counsel's request for a continuance so that genetic testing of A.R. could be completed, and Robert could be present to testify. We agree with Robert's contention that the court erred in refusing to stay the proceedings pursuant to the SCRA, and reverse and remand the case for a new jurisdictional and dispositional hearing.

BACKGROUND
A.R. was born in September 2007, at 34 weeks' gestation, to Amy R. and Robert, Amy's husband. A.R. spent her first two weeks in the Naval Medical Center San Diego (Naval Medical Center) neonatal intensive care unit because she was experiencing problems involving "respiratory distress, apnea, feeding, and growing." A.R. was again placed in the neonatal intensive care unit six days after her discharge because she had "an apparent life threatening event when she grunted, stopped breathing and turned red." Medical personnel determined that the cause of this event was decreased temperature due to inadequate swaddling. A.R. had a well baby visit on October 11 and was reported to be healthy and developing normally.
In early November 2007, Amy took A.R. to the Naval Medical Center where she was diagnosed as having an ear infection. A day or two later, Amy took A.R. to Pomerado Hospital where A.R. was prescribed amoxicillin. When A.R. began vomiting later at home, Amy took her back to Pomerado Hospital. At the hospital, medical personnel observed bruises on A.R.'s body. More bruises appeared on A.R.'s body while she was at the hospital, wherever pressure was applied. Doctors became concerned that A.R. might have a blood disorder.
On November 15, 2007, A.R. was transported by ambulance to Rady Children's Hospital where an emergency room doctor examined her. She had linear bruises on her thighs and a small linear bruise on her right upper arm and left shoulder. A.R. was discharged because no more bruising occurred and bleeding studies were normal. Later that day, however, A.R. vomited again. Amy and Robert took her back to Rady Children's Hospital.
*737 At Rady Children's Hospital, physician Cynthia Kuelbs questioned whether Pomerado Hospital personnel had checked A.R.'s entire body for bruising. Dr. Kuelbs believed that the bruising on A.R.'s shoulder "may have been an inflicted injury." Dr. Kuelbs acknowledged that she did not have complete records from the Naval Medical Center or Pomerado Hospital and was "at a loss to explain the bruises which appeared at Pomerado Hospital." She believed that the bruise on A.R.'s forearm might have been caused by a blood draw, and that what appeared to be bruises in A.R.'s groin area might actually be a rash. Dr. Kuelbs was concerned because A.R. was not tracking objects with her eyes.
Scans of A.R.'s head revealed both new and old[1] subdural hemorrhages, but skeletal surveys and retinal examinations were negative. Both a radiologist and Dr. Kuelbs expressed concern that the hemorrhages were caused by nonaccidental trauma. However, a neurosurgery resident was concerned that A.R.'s symptoms might have been the result of a bleeding disorder. Rady Children's Hospital began an "extensive work up for a bleeding problem." A metabolic screen was ordered to rule out an underlying metabolic problem. In addition, a further ophthalmologic evaluation was planned, and a hematological evaluation was scheduled for December.
On November 15, 2007, a hospital hold was placed on A.R. On November 17, she was detained in a foster home. On November 20, the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition pursuant to Welfare and Institutions Code section 300, subdivision (a).[2] The petition alleged that on or about November 15, A.R. "was discovered to have a detrimental and traumatic condition, consisting of old and new subdural hemorrhages[, which] condition would not ordinarily be sustained except as a result of the unreasonable acts of the child's mother and/or father."
Both Robert and Amy appeared at the November 20, 2007 detention hearing. The court appointed counsel and set a jurisdictional hearing for December 11. On December 11, the court granted the joint request of Robert's and Amy's attorneys that a vial of blood be drawn from A.R. for independent testing. The court set a settlement conference for January 16, *738 2008, and a trial for February 1. On January 16, both counsel asked for a continuance of the trial. The court granted the request, citing the pending results of further medical testing that Dr. Kuelbs had ordered, and Amy's counsel's need for further investigation. The court continued the trial to March 7 and set a settlement conference for February 20.
On February 19, 2008, Dr. Kuelbs reported that metabolic test results obtained in late January were not completely normal and that the results did not explain A.R.'s symptoms. Dr. Kuelbs stated that the tests showed that it was unlikely that A.R. had a condition called glutaric acidemia, a genetic metabolic disorder, but recommended an evaluation by the metabolics team. Dr. Kuelbs believed that once the evaluation was complete, she would be able to say whether something other than trauma could have caused A.R.'s subdural hemorrhages.
On February 20, 2008, the court continued the trial to April 25 and set a further settlement conference for April 23, citing the fact that the metabolic evaluation would probably not occur until April 21, and that Robert's attorney needed time to provide the test results to her expert before trial. The court gave the Agency discretion to detain A.R. with Amy, with the concurrence of A.R.'s counsel.
On April 15, 2008, A.R. had an appointment with a metabolic specialist, who took blood and urine samples. The purpose of the testing was to determine whether A.R. had glutaric acidemia. Results from the urine test were expected in two weeks, and results from the blood test were expected in six weeks. A.R.'s next medical appointment was set for June 3.
On April 17, 2008, Robert's attorney filed a motion to stay the proceedings pursuant to the SCRA. A copy of a letter from the Navy dated March 4 was attached to the motion. The letter stated only that Robert would be deployed in Iraq from March 17 until November. The letter did not set forth all of the information that the SCRA requires (see fn. 4, post).
On April 23, 2008, the court ordered A.R. detained with Amy. Because the test results were still not available, the court continued the trial to May 19. The court noted that "there could well be a motion to continue on [May 19] if [Robert's counsel] obtains certain documentation from the military with respect to [Robert's] deployment." Amy's counsel noted that May 19 was the six-month date[3] and stated that the test results would probably not be *739 available until June 3. The court acknowledged this and said, "[W]e are going to have to set it for May [19] and just address those issues on that particular date."
On May 14, 2008, the manager of the genetics laboratory orally reported to the social worker that A.R.'s test results were inconclusive. The manager said that further testing was needed to rule out glutaric acidemia.
On May 19, 2008, the Agency filed a report that contained the results of A.R.'s April 24 metabolic panel. Amy's counsel asked for an opportunity to forward the results to her expert. Robert's counsel filed a letter from the Navy dated April 30 that set forth all of the information required by the SCRA, asked that the letter be deemed an attachment to her earlier motion, and requested that the proceedings be stayed. Robert's counsel argued that Robert would be prejudiced if he were not present to testify and to hear the additional evidence. Counsel also requested a continuance, noting that the two experts she had contacted would not look at A.R.'s medical records until they had the additional test results that were contained in the report the Agency had just filed.
The court concluded that whether to stay the proceedings pursuant to the SCRA was discretionary. Citing the time constraints that apply in juvenile dependency cases, the court declined to stay the proceedings. The court also denied Robert's counsel's request for a continuance, citing section 352, subdivision (b), and proceeded with the hearing. The court sustained the objections of Amy's and Robert's attorneys to the Agency's report that had been filed that day, but received other reports and heard testimony from the social worker. Robert's counsel argued that the medical information was inconclusive and asked the court to dismiss the petition. Counsel stated that if the court were to make a true finding, she would object to A.R.'s removal from Robert's custody and to supervised visitation. The court made a true finding on the petition, declared A.R. a dependent, removed her from Robert's custody, and placed her with Amy. The court did not make an order concerning visitation.

DISCUSSION

I

The Appeal Is Not Moot
The Agency, joined by A.R.'s appellate counsel, requests that this court augment the record on appeal with a reporter's transcript, minute order, and formal order from an August 11, 2008, hearing, and dismiss the appeal as *740 moot. According to the copies of the reporter's transcript and orders attached to the Agency's motion, on August 11 the court awarded custody of A.R. to Amy, allowed supervised visits for Robert and, with Robert's consent through counsel, terminated dependency jurisdiction. The Agency contends that the termination of jurisdiction renders Robert's appeal moot.
(1) Robert argues that his appeal should not be dismissed as moot. He notes that his contact with A.R. is severely restricted as a direct result of the jurisdictional and dispositional findings and orders. (See In re James B. (1986) 184 Cal.App.3d 524, 528 [229 Cal.Rptr. 206], superseded by statute on another ground as stated in In re David H. (2008) 165 Cal.App.4th 1626, 1642, fn. 14 [82 Cal.Rptr.3d 81].) To overcome those restrictions, he will have to prove, in family court, that "there has been a significant change of circumstances... and modification of the order is in [A.R.'s] best interests...." (§ 302, subd. (d); accord, In re Joshua C. (1994) 24 Cal.App.4th 1544, 1548 [30 Cal.Rptr.2d 10]; In re Chantal S. (1996) 13 Cal.4th 196, 209-210 [51 Cal.Rptr.2d 866, 913 P.2d 1075].) "An issue is not moot if the purported error infects the outcome of subsequent proceedings." (In re Dylan T. (1998) 65 Cal.App.4th 765, 769 [76 Cal.Rptr.2d 684].)
We deny the Agency's motion to augment the record and to dismiss the appeal as moot.

II

The Court Erred by Failing to Stay the Proceedings for 90 Days Pursuant to the SCRA
Robert contends that the juvenile court erred by refusing to stay the proceedings pursuant to the SCRA, and instead proceeding with the jurisdictional hearing. Because there is no dispute that the factual predicates for the application of the SCRA have been satisfied in this case, this appeal presents a question of law. We therefore review the matter de novo. (In re Adrianna P. (2008) 166 Cal.App.4th 44, 54 [81 Cal.Rptr.3d 918].)
(2) The SCRA applies to any judicial proceeding in state court, except criminal proceedings. (50 U.S.C. Appen. § 512(a), (b).) The purposes of the SCRA are "(1) to provide for, strengthen, and expedite the national defense through protection extended . . . to servicemembers of the United States to *741 enable such persons to devote their entire energy to the defense needs of the Nation; and [¶] (2) to provide for the temporary suspension of judicial . . . proceedings . . . that may adversely affect the civil rights of servicemembers during their military service." (50 U.S.C. Appen. § 502.) "[T]he SCRA must be construed to prevent any disadvantage to a servicemember litigant resulting from his or her military service" and "must be `liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation.' [Citations.]" (George P. v. Superior Court (2005) 127 Cal.App.4th 216, 225 [24 Cal.Rptr.3d 919] (George P.).)
(3) Upon application, a military servicemember who is a party to a civil action is entitled to a stay of the proceedings for at least 90 days. (50 U.S.C. Appen. § 522(b)(1).)[4] The application must include a letter setting forth facts that show how "current military duty requirements materially affect the servicemember's ability to appear and stating a date when the servicemember will be available to appear" and "[a] letter . . . from the . . . commanding *742 officer stating that the servicemember's current military duty prevents appearance and that military leave is not authorized ... at the time of the letter." (50 U.S.C. Appen. § 522(b)(2)(A), (B).) "The court must stay the proceeding for not less than 90 days" upon such an application. (George P., supra, 127 Cal.App.4th at pp. 223-224.) "The stay is required whenever there is a showing of how military duty materially affects a servicemember's ability to appear in the action supported by a letter from the servicemember's commanding officer." (Id. at p. 224.)[5]
Before it was amended in 2008, the stay provision of the SCRA applied "[i]n any judicial action or proceeding . . . ." (50 U.S.C. Appen. former § 522(a).) The provision necessarily included juvenile dependency proceedings, which "`are civil in nature . . . .'" (In re Malinda S. (1990) 51 Cal.3d 368, 384 [272 Cal.Rptr. 787, 795 P.2d 1244], superseded by statute on another ground as stated in People v. Otto (2001) 26 Cal.4th 200, 207 [109 Cal.Rptr.2d 327, 26 P.3d 1061].) The 2008 amendment added the phrase, "including any child custody proceeding," after the phrase "civil action or proceeding" (Pub.L. No. 110-181 (Jan. 28, 2008) 122 Stat. 128), thus making it even more clear that the SCRA applies here. Indeed, the Agency concedes that "the SCRA applies in juvenile dependency proceedings."
(4) As mentioned above, it is undisputed that Robert met the SCRA's conditions necessary to obtain a stay. (50 U.S.C. Appen. § 522(b).) His attorney filed with the juvenile court a letter from a naval administrative *743 officer, written at the direction of the commanding officer, stating that Robert was on active duty on a ship deployed to the Middle East, that he was scheduled to return to San Diego around October 2008, and that he was not authorized to take leave for the remainder of his deployment. Because the letter met the statutory conditions, a stay was mandatory.[6]
The Agency contends that the SCRA does not override statutory mandates regarding the expeditious resolution of juvenile dependency cases. The Agency maintains that the juvenile court properly weighed the competing interests represented by the SCRA and the juvenile dependency law, and determined that it had the discretion to deny Robert's request for a stay. In support of its position, the Agency cites section 352, subdivision (b) and the Adoption and Safe Families Act of 1997 (ASFA) (Pub.L. No. 105-89 (Nov. 19, 1997) 111 Stat. 2115). Among the purposes of the ASFA are to "minimize delay in juvenile dependency proceedings and reduce the time that dependent children stay in temporary placement." (In re Christina A. (2001) 91 Cal.App.4th 1153, 1163 [111 Cal.Rptr.2d 310].) Section 352, subdivision (b) also recognizes the need to minimize delay, stating "Notwithstanding any other provision of law, if a minor has been removed from the parents' . . . custody, no continuance shall be granted that would result in the dispositional hearing . . . being completed longer than 60 days after the [detention] hearing . . . , unless the court finds that there are exceptional circumstances requiring such a continuance. . . . In no event shall the court grant continuances that would cause the [dispositional] hearing . . . to be completed more than six months after the [detention] hearing . . . ."
(5) Clearly, in a dependency case, the interests of the child in attaining a permanent, stable placement are exceedingly important. (In re Corey A. (1991) 227 Cal.App.3d 339, 346-347 [277 Cal.Rptr. 782].) For this reason, the proceedings should be resolved as quickly as possible. (In re Marilyn H. (1993) 5 Cal.4th 295, 308, 310 [19 Cal.Rptr.2d 544, 851 P.2d 826].) However, those principles do not override congressional intent, as expressed in the SCRA, to strengthen national defense by providing for the temporary suspension of a court proceeding that might adversely affect the rights of an active military servicemember. (50 U.S.C. Appen. § 502.) "There is indeed a presumption against pre-emption in areas of traditional state regulation such *744 as family law. [Citation.] But that presumption can be overcome where, as here, Congress has made clear its desire for pre-emption." (Egelhoff v. Egelhoff (2001) 532 U.S. 141, 151 [149 L.Ed.2d 264, 121 S.Ct. 1322] (Egelhoff).)[7] In the SCRA, Congress explicitly states its intent to apply the legislation to state court child custody proceedings. Further, the six-month time limit of section 352, subdivision (b) is "not mandatory in the jurisdictional sense." (In re Richard H. (1991) 234 Cal.App.3d 1351, 1362 [285 Cal.Rptr. 917].) We therefore conclude that the mandatory stay provision of the SCRA overrides section 352, subdivision (b) and the ASFA.
The juvenile court erred by refusing to stay the proceedings for 90 days pursuant to the SCRA, and going forward with the jurisdictional and dispositional hearing. In light of our conclusion, we need not discuss at length Robert's contention that the court abused its discretion by denying his trial counsel's request for a continuance. Insofar as Robert argues that the court should have continued the hearing for the completion of genetic testing, that contention is not ripe. There is no indication in the record how long the testing would have taken; it might very well have been completed within the 90-day stay.[8]
Insofar as Robert argues that the court should have continued the hearing to allow him to be present to testify, he is incorrect. The court was not obligated to grant an open-ended continuance until Robert returned to San Diego. (§ 352, subd. (a) ["[N]o continuance shall be granted that is contrary to the interest of the minor. . . . [¶] Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary . . . ."]; D.E. v. Superior Court, supra, 111 Cal.App.4th at p. 512 [the court had no discretion to extend the six-month time limit of section 352, subdivision (b) and the child's right to prompt resolution of the proceedings outweighed the incarcerated father's statutory right to be present at jurisdictional and dispositional hearing].)
The error in refusing to stay the proceedings pursuant to a proper request made under the SCRA requires that we reverse the judgment and remand for a new jurisdictional and dispositional hearing.[9]

*745 DISPOSITION
The judgment is reversed and the case is remanded for a new jurisdictional and dispositional hearing. Because more than 90 days have elapsed during the pendency of this appeal, on remand the juvenile court need not grant Robert an initial 90-day SCRA stay.
Haller, Acting P. J., and O'Rourke, J., concurred.
NOTES
[1] Dr. Kuelbs believed that the older hemorrhage was consistent with the timing of A.R.'s hospitalization at the Naval Medical Center for the apparent life-threatening event, but admitted that "this is not an exact science." Dr. Kuelbs also believed that the newer hemorrhage explained A.R.'s "more recent symptoms of vomiting and irritability."
[2] Statutory references are to the Welfare and Institutions Code unless otherwise specified.
[3] This was a reference to section 352, subdivision (b), which states that if the child is detained, the dispositional hearing is to be completed within six months of the detention hearing.
[4] Title 50 United States Code Appendix section 522 provides: "(a) Applicability of section. [¶] This section applies to any civil action or proceeding, including any child custody proceeding, in which the plaintiff or defendant at the time of filing an application under this section[¶] (1) is in military service or is within 90 days after termination of or release from military service; and [¶] (2) has received notice of the action or proceeding. [¶] (b) Stay of proceedings. [¶] (1) Authority for stay.[¶] At any stage before final judgment in a civil action or proceeding in which a servicemember described in subsection (a) is a party, the court may on its own motion and shall, upon application by the servicemember, stay the action for a period of not less than 90 days, if the conditions in paragraph (2) are met. [¶] (2) Conditions for stay. [¶] An application for a stay under paragraph (1) shall include the following: [¶] (A) A letter or other communication setting forth facts stating the manner in which current military duty requirements materially affect the servicemember's ability to appear and stating a date when the servicemember will be available to appear. [¶] (B) A letter or other communication from the servicemember's commanding officer stating that the servicemember's current military duty prevents appearance and that military leave is not authorized for the servicemember at the time of the letter. [¶] (c) Application not a waiver of defenses. [¶] An application for a stay under this section does not constitute an appearance for jurisdictional purposes and does not constitute a waiver of any substantive or procedural defense (including a defense relating to lack of personal jurisdiction). [¶] (d) Additional stay. [¶] (1) Application. [¶] A servicemember who is granted a stay of a civil action or proceeding under subsection (b) may apply for an additional stay based on continuing material affect of military duty on the servicemember's ability to appear. Such an application may be made by the servicemember at the time of the initial application under subsection (b) or when it appears that the servicemember is unavailable to prosecute or defend the action. The same information required under subsection (b)(2) shall be included in an application under this subsection. [¶] (2) Appointment of counsel when additional stay refused. [¶] If the court refuses to grant an additional stay of proceedings under paragraph (1), the court shall appoint counsel to represent the servicemember in the action or proceeding. [¶] (e) Coordination with section 201 [section 521 of this Appendix]. [¶] A servicemember who applies for a stay under this section and is unsuccessful may not seek the protections afforded by section 201 [section 521 of this Appendix]. [¶] (f) Inapplicability to section 301 [section 531 of this Appendix]. [¶] The protections of this section do not apply to section 301 [section 531 of this Appendix]."
[5] The court in George P. also stated that "section 522 of the SCRA sharply restricts the court's discretion with respect to granting or denying the initial 90-day stay." (George P., supra, 127 Cal.App.4th at p. 224.) Rather than "restrict[ing] the court's discretion," section 522 of the SCRA eliminates any discretion with regard to the initial stay once the requirements of subdivision (b) of section 522 of the SCRA are met. (George P., at p. 224.) Further, the sole issue in George P. was the juvenile court's denial of a request for an additional discretionary stay following the expiration of the initial 90-day mandatory stay. (Id. at p. 219.) Thus, the case is inapposite.

Other cases that the Agency cites are also inapplicable to the SCRA issue. Two of those cases concerned the predecessor to the SCRA, the Soldiers' and Sailors' Civil Relief Act of 1940 (50 U.S.C. Appen. former § 501 et seq.), which provided for a stay "`unless, in the opinion of the court, the ability of plaintiff to prosecute the action or the defendant to conduct [his] defense is not materially affected by reason of [his] military service.'" (Louis J. v. Superior Court (2002) 103 Cal.App.4th 711, 713, 715 [127 Cal.Rptr.2d 26]; see Christine M. v. Superior Court (1999) 69 Cal.App.4th 1233, 1241-1245 [82 Cal.Rptr.2d 220].) Others involved the denial of a request for self-representation (In re A.M. (2008) 164 Cal.App.4th 914 [79 Cal.Rptr.3d 620]) and the interplay between the six-month limit for completion of the dispositional hearing (§ 352, subd. (b)) and an incarcerated parent's right to be present at the hearing (Pen. Code, § 2625; D.E. v. Superior Court (2003) 111 Cal.App.4th 502, 505-506, 509-514 [4 Cal.Rptr.3d 10]).
[6] The parties do not discuss when the 90-day stay would have begunthe date on which Robert was deployed, the date his stay request was filed, the date his second letter from the Navy was filed, or some other date. In light of the fact that more than 90 days have elapsed since the court denied the stay, we need not resolve this question.
[7] In Egelhoff, the Supreme Court held that a Washington statute providing for automatic revocation, upon divorce, of designation of a spouse as beneficiary was preempted by the Employee Retirement Income Security Act of 1974 (29 U.S.C.A. § 1001 et seq.).
[8] If the tests were not completed within that period, that would present a different issue.
[9] Because more than 90 days have elapsed during the pendency of this appeal, the juvenile court need not grant Robert an initial 90-day SCRA stay in the event that he requests one.