[No. B208675. Second Dist., Div. Seven. Apr. 13, 2009.]

In re C.C., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
LISA M., Defendant and Appellant.

## Counsel

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Raymond G. Fortner, Jr., County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

## Opinion

**PERLUSS, P. J.**—Lisa M. appeals from an order made by the juvenile court at the June 9, 2008 disposition hearing (Welf. & Inst. Code, § 361)[1] denying her visitation and conjoint therapy with her 12-year-old son, C.C. Since this appeal was filed, the juvenile court has restored monthly monitored visitation through a family law "exit order" and terminated its jurisdiction. (§ 362.4.) The issues raised in this appeal are effectively moot. However, because the court's finding of detriment and visitation order were not made in accordance with the proper standard, to avoid any possible collateral prejudice to Lisa we reverse the challenged order denying visitation without a remand for further proceedings rather than simply dismiss the appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

The Los Angeles County Department of Children and Family Services (Department) detained C.C. from his mother on July 5, 2007 after a month-long investigation, based on allegations of serious physical harm (§ 300,

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

subd. (a)) and failure to protect (§ 300, subd. (b)). Before his detention C.C. split his time equally between Lisa and his father, Patrick C. According to C.C., then 10 years old, his mother had frequently struck him, grabbed him by the neck or chin and verbally abused him. C.C. was afraid Lisa would hurt him more seriously if he was forced to stay with her; he wanted to live exclusively with his father, his father's girlfriend and her two daughters. C.C.'s allegations were largely substantiated by other family members and acquaintances, including his mother's roommate. At the detention hearing the juvenile court ordered monitored visits for Lisa and directed the Department to provide both parents with referrals and to secure individual counseling for C.C.

On July 26, 2007 the Department filed an amended petition including additional allegations of physical and emotional abuse by Lisa. The Department also filed a jurisdiction/disposition report containing multiple witness accounts of unstable, violent conduct by Lisa. In one instance Lisa physically attacked Patrick's girlfriend, Jackie, at Jackie's hair salon when Lisa showed up unexpectedly and tried to drag C.C. into her car. In another instance recounted by Lisa's roommate, when C.C. locked the door to his room to escape his mother, she removed the door with a screwdriver and screamed at him for 40 minutes while throwing things at him. The roommate, a counselor at a mental health center, described Lisa as an "unstable, unmedicated bipolar," who was more "unstable than some of [her] most severe patients." The roommate's coworker, who was coincidentally Lisa's ex-sister-in-law, concurred, describing Lisa as "borderline, bipolar or narcissistic." The Department also reported C.C. had refused to engage with his mother during a monitored visit that was terminated by the social worker when C.C. became extremely upset.

At the subsequent jurisdiction/disposition hearing the court ordered the Department to facilitate visits between Lisa and C.C. in a therapeutic setting. A week later, the court ordered Lisa to undergo an Evidence Code section 730 psychological evaluation focusing on Lisa's relationship with her son and his refusal to see her, as well as Lisa's own psychological health.

On September 7, 2007 the Department filed an ex parte request seeking suspension of visitation between Lisa and C.C. The application was based on a letter from C.C.'s therapist, Patricia Correa, indicating his level of distress had escalated after each of the three previous monitored visits. C.C. had stated he did not want to have contact with Lisa, a position Dr. Correa viewed as justified, and had threatened to harm himself and Lisa if forced to visit her. The court suspended visitation pending an evidentiary hearing. At the hearing both Dr. Correa and the visitation monitor testified. According to the monitor, who acknowledged Lisa's conduct at the visits had been appropriate, C.C.

had refused to engage with Lisa and had stated repeatedly he did not want to see her. During the third visit, after C.C. left the room but was required to come back in, he sat on the floor behind the couch, banging his head on the wall and crying. The monitor corroborated Dr. Correa's view further visits would be detrimental and C.C. harbored a lot of anger he would need to work through before he could be expected to have a relationship with Lisa.

After hearing the testimony of Dr. Correa and the monitor, the court found by clear and convincing evidence continued visitation between C.C. and Lisa would be detrimental to C.C. and suspended visitation. Adjudication of the petition was continued to November 1, 2007.

On October 11, 2007 the psychiatrist retained to complete the Evidence Code section 730 evaluation, Timothy Collister, submitted his report to the court. Dr. Collister concluded, based on testing and interviews of Lisa, Patrick and C.C., Lisa's psychological profile was within normal range; C.C.'s distress was largely a product of the parents' own conflicts; and C.C. should be required to have regular visits with Lisa. In a written response to the section 730 evaluation, the Department challenged Dr. Collister's characterization of Lisa's abuse of C.C. as mild and his conclusion Patrick was contributing to C.C.'s anxiety. Dr. Correa similarly disagreed with the evaluation's conclusions, noting that, since visits had been suspended, C.C. was much happier and was receiving "straight A's" in school. She believed C.C. would eventually be willing to try visits again if allowed to first work through his anger. Nonetheless, in light of Dr. Collister's conclusions, the court granted the Department discretion to allow visits between C.C. and Lisa in a therapeutic environment.

The jurisdiction hearing on the amended petition began on November 1, 2007. Two allegations were sustained: the first relating to Lisa's use of inappropriate physical discipline (§ 300, subd. (a)); and the second relating to her emotional abuse of C.C. (§ 300, subd. (c)). The court then considered visitation issues. Dr. Correa reiterated her opinion it was premature to force C.C. to visit with Lisa. Pending completion of the hearing, the court suspended those visits. The court also granted Patrick's request that Dr. Collister's raw data be sent to a different psychiatrist for reevaluation.

At the continued hearing on December 17, 2007 Dr. Collister testified regarding his conclusions, stating in part his opinion C.C. had been inappropriately allowed to control visitation, a position that was contributing to his "turmoil." He also restated his concern Patrick had fostered the conflict between Lisa and C.C., even though he acknowledged Patrick's concern C.C. might harm himself or commit suicide. Nonetheless, he discounted Patrick's concerns based on his assessment Patrick demonstrated "passive-aggressive

personality disorder with paranoid traits." Based on Dr. Collister's testimony, the court ordered a monitored therapeutic visit between Lisa and C.C.

Two weeks later, on January 2, 2008, the Department filed a section 388 petition requesting the court suspend the order for a therapeutic monitored visit, citing Dr. Correa's concern the visit was not in C.C.'s best interest and would seriously undermine the progress he had made with her. The Department submitted an interim report recounting C.C.'s opposition to the visit and his statement that no one believed how much his mother had hurt him. He stated he was happy with his father and his father's new family. On January 16, 2008 the court denied the section 388 petition and ordered therapeutic visitation be set up and implemented at the discretion of Dr. Bruce Derman. On March 6, 2008 the court also ordered conjoint therapy between Lisa and C.C. under the direction of Dr. Derman and, based on what the court understood to be the recommendation of Dr. Derman, authorized the Department to conduct a monitored visit between Lisa and C.C. in a neutral location.

In a report dated April 4, 2008, however, the Department advised the court Dr. Derman had not recommended the Department arrange a monitored visit between Lisa and C.C. In Dr. Derman's view such a visit would be counterproductive absent his participation. Instead, C.C. had made the request, having believed he would not have to talk to his mother if he opted for the monitored visit instead of conjoint therapy. In keeping with this request, the Department recommended one "experimental" monitored visit in a neutral setting to be continued only at the recommendation of Dr. Derman.

By all accounts, the experimental monitored visit was a disaster. The social worker reported Lisa had been resistant and uncooperative during scheduling of the visit and C.C. had participated under protest. Once inside the restaurant (the neutral setting selected by C.C.), he had demanded Lisa admit "all the ways you hurt me" and the names she had called him. Although Lisa tried to answer, C.C. rejected her attempts and asked to leave the restaurant after 15 minutes. He refused to participate in any further visits, even if supervised by Dr. Derman. C.C. had already participated in six conjoint therapy sessions with Lisa and stated he no longer trusted Dr. Derman could change his mother. Based on C.C.'s age, intelligence and consistency, the Department recommended visitation be suspended and C.C. return to individual therapy with Dr. Correa.

Meanwhile, Patrick had submitted Dr. Collister's raw data to a different psychologist for interpretation and review. According to the second psychologist's report, Dr. Collister had misinterpreted and manipulated data. In particular, his assessments of Patrick's and C.C.'s mental states were flawed

and unduly negative. This different assessment of Patrick's effect on C.C. was supported by Dr. Derman's assertion he had "see[n] no evidence at this time there is any parent alienation being facilitated by the father . . . ."

At the April 16, 2008 hearing, after Dr. Derman acknowledged conjoint therapy would be effective only if C.C. was willing to participate,[2] the court suspended conjoint therapy and set a date for the contested disposition hearing.

On June 9, 2008 the court heard extensive testimony from Dr. Correa. According to Dr. Correa, C.C., then almost 12 years old, intelligent and articulate, was performing well at school and happy with his father's family. He continued to state he did not want to see his mother and did not believe she had changed. Nonetheless, Dr. Correa perceived less hostility from C.C. and more willingness to discuss possible visitation in the future now that he was not being forced to engage with her. She expressed her opinion C.C. would be better equipped and more receptive to reestablishing a relationship with his mother as he aged. Pushed at this point, he was likely to choose resistance and hostility. Based on Dr. Correa's assessment, C.C.'s counsel requested the court find further visitation to be detrimental to C.C. The Department also requested that visitation be terminated.

Based on C.C.'s age, Dr. Derman's ambivalent prognosis and Dr. Correa's testimony, the court found further visitation with Lisa would be detrimental to C.C. and suspended visitation pending a review hearing set for September 26, 2008. The court also expressed doubt about the extent of Lisa's therapeutic progress and ordered Lisa to continue individual therapy and to complete the Department-recommended parenting and anger management programs. Lisa appealed.

While Lisa's appeal was pending, C.C.'s dependency case continued with periodic review hearings until March 11, 2009. At the hearing on that date, the juvenile court entered a family law exit order pursuant to section 362.4 awarding sole legal and physical custody of C.C. to Patrick, authorized monitored visitation between C.C. and Lisa in a therapeutic setting at least once per month and terminated juvenile court jurisdiction.[3]

---

[2] In a February 21, 2008 letter to the court, before five of the six conjoint therapy sessions had occurred, Dr. Derman had opined his prognosis would be extremely guarded if he were not able to therapeutically improve C.C.'s negative attitude toward his mother within the next five sessions.

[3] Pursuant to Evidence Code sections 452, subdivision (d), and 459, subdivision (a), we take judicial notice of the March 11, 2009 minute order.

## CONTENTIONS

Lisa contends the trial court erred in finding continued visitation with her would be detrimental to C.C. and, in essence, improperly permitted C.C. himself to preclude or veto visitation. She also contends the court erred in failing to order conjoint therapy and reasonable efforts were not made to avoid C.C.'s removal from her home.

Based on the March 11, 2009 order restoring monitored visitation and terminating juvenile court jurisdiction, we asked the parties to advise the court whether the instant appeal has become moot. The Department contends it has. Lisa agrees "the primary issues raised in the appeal" are now moot, but urges us to decide the case nonetheless because of the possibility she will be prejudiced by the court's finding of detriment and order terminating visitation in some collateral proceeding.

## DISCUSSION

1. *The Termination of Juvenile Court Jurisdiction Renders the Case Moot Unless a Potential Exists for Adverse Collateral Consequences*

■ As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. (*In re Michelle M.* (1992) 8 Cal.App.4th 326, 330 [10 Cal.Rptr.2d 64].) However, dismissal for mootness in such circumstances is not automatic, but "must be decided on a case-by-case basis." (*In re Kristin B.* (1986) 187 Cal.App.3d 596, 605 [232 Cal.Rptr. 36]; *In re Hirenia C.* (1993) 18 Cal.App.4th 504, 517–518 [22 Cal.Rptr.2d 443]; see *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1404 [81 Cal.Rptr.3d 747].)

■ "An issue is not moot if the purported error infects the outcome of subsequent proceedings." (*In re Dylan T.* (1998) 65 Cal.App.4th 765, 769 [76 Cal.Rptr.2d 684].) In *Dylan T.* the appellate court concluded the erroneous denial of visitation to an incarcerated parent jeopardized the parent's interests in subsequent proceedings and declined to dismiss the appeal as moot, even though the parent was no longer incarcerated. (*Id.* at pp. 769–770; see also *In re A.R.* (2009) 170 Cal.App.4th 733, 740 [88 Cal.Rptr.3d 448] [service-member's appeal of court's refusal to stay dependency proceeding not moot even though jurisdiction terminated because his rights had been adversely affected by award of sole custody to mother].)

In this case, not only has the juvenile court terminated jurisdiction, but also, in its family law exit order, the court restored Lisa's right to monitored

visitation with C.C., the very relief she seeks by her appeal.[4] Although the March 11, 2009 exit order would thus seem to doubly moot Lisa's appeal, Lisa contends the finding of detriment upon which the challenged order denying visitation was based creates the possibility of prejudice in subsequent family law proceedings. Lisa's concern is highly speculative. However, in an abundance of caution and because dismissal of the appeal operates as an affirmance of the underlying judgment or order (*In re Jasmon O.* (1994) 8 Cal.4th 398, 413 [33 Cal.Rptr.2d 85, 878 P.2d 1297]; *County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1005 [78 Cal.Rptr.2d 272]), we consider the merits of her appeal.

> 2. *The Juvenile Court's Order Denying Visitation Is Not Supported by the Necessary Finding That Visitation Would Jeopardize C.C.'s Safety*

■ As we emphasized in *In re S.H.* (2003) 111 Cal.App.4th 310 [3 Cal.Rptr.3d 465] (*S.H.*), "Visitation is a necessary and integral component of any reunification plan. [Citations.] 'An obvious prerequisite to family reunification is regular visits between the noncustodial parent or parents and the dependent children "as frequent[ly] as possible, consistent with the well-being of the minor." ' " (*Id.* at p. 317, fn. omitted.) "[T]he power to decide whether *any* visitation occurs belongs to the court alone." (*Ibid.*; accord, *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008–1009 [57 Cal.Rptr.2d 861] ["The juvenile court has the sole power to determine whether visitation will occur and may not delegate its power to grant or deny visitation to the [department of social services]."].) "It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances." (*S.H.*, at p. 317.)

Visitation orders made at the time of the dispositional hearing are governed by section 362.1. Subdivision (a)(1)(A) of that section provides, "In order to maintain ties between the parent or guardian and any siblings and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent or guardian, . . . any order placing a child in foster care, and ordering reunification services, shall provide as

---

[4] To the extent Lisa complains the juvenile court's June 9, 2008 disposition order failed to direct Patrick to participate in counseling or parenting programs, she is not an aggrieved party and has no standing to appeal. (See *In re D.S.* (2007) 156 Cal.App.4th 671, 674 [67 Cal.Rptr.3d 450] ["Standing to challenge an adverse ruling is not established merely because a parent takes a position on an issue that affects the minor [citation]; nor can a parent raise the minor's best interest as a basis for standing [citation]. Without a showing that a parent's personal rights are affected by a ruling, the parent does not establish standing. [Citation.] To be aggrieved or affected, a parent must have a legally cognizable interest that is affected injuriously by the juvenile court's decision."].)

follows: [¶] . . . Subject to subparagraph (B), for visitation between the parent or guardian and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child." Subdivision (a)(1)(B) provides, "No visitation order shall jeopardize the safety of the child. . . ."

The juvenile court premised its order suspending visitation on its finding by clear and convincing evidence that further visitation with Lisa would be detrimental to C.C. In the words of the court, "My best judgment is that I am very convinced it would be detrimental to him and not contribute to his well-being or to his making progress in having a relationship with his mother. I don't think I need to find that he'll act out or whether there will be a tantrum or flunking school to find detriment. You have to look at the person . . . [and] the fact that he seems to have . . . regressed in his willingness to consider that mother is changing."

■ Detriment is a familiar standard in child welfare determinations; but, as several courts have acknowledged, the notion of detriment is at best a nebulous standard that depends on the context of the inquiry. For example, in *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 [20 Cal.Rptr.3d 336], in which the court reversed a finding of detriment based on concerns a parent was too poor to afford housing and lacked appropriate parenting skills, the court explained, "that standard, while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member." Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being. (*Id.* at p. 789; *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505 [27 Cal.Rptr.3d 157]; see also *In re Yvonne W., supra*, 165 Cal.App.4th at p. 1402 [reversing order based on finding of detriment when agency failed to present evidence child would suffer serious psychological or emotional injury].)

■ The underpinnings of a finding of detriment should also reflect the particular statutory context in which the finding is made. For instance, under section 361.2, subdivision (a), a child who has been removed from one parent's custody "shall" be placed with the noncustodial parent (if requested) "unless [the court] finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Clearly, under this statute a court has broad discretion to evaluate not only the child's physical safety but also his or her emotional well-being. In an appropriate case, all that might be required is a finding such a placement would impair the emotional security of the child. (Cf. *In re Jacob P.* (2007) 157 Cal.App.4th 819, 829 [68 Cal.Rptr.3d 817] [" 'The two standards [best

interest and detriment] are basically two sides of the same coin. What is in the best interests of the child is essentially the same as that which is not detrimental to the child.' "].)

██ Under section 362.1, subdivision (a), however, visitation with the parent is a mandatory element of the reunification plan with the single exception that "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B); see *S.H., supra*, 111 Cal.App.4th at p. 317 & fn. 9.) In other words, when reunification services have been ordered and are still being provided, as they were in this case, some visitation is mandatory unless the court specifically finds any visitation with the parent would pose a threat to the child's *safety*.[5] The frequency of such visits, in contrast, depends on a broader assessment by the court of the child's "well-being." (§ 362.1, subd. (a)(1)(A); but see *In re Christopher H., supra*, 50 Cal.App.4th at p. 1008 [court may deny parent visitation "if visitation would be harmful to the child's emotional well-being"].)

By way of comparison to the standard set forth in section 362.1, subdivision (a), a dependent child of the juvenile court may be removed from his or her parent's physical custody only upon a showing by clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor . . ." (§ 361, subd. (c)(1)), a much more comprehensive test for evaluating the parent-child relationship than simply the issue of safety. A comparable standard governs the issue of parental visitation when reunification services are terminated. Although the legislative preference remains for continued parent-child visitation until the hearing for the selection and implementation of a permanent plan pursuant to section 366.26, such visitation may be terminated if the court finds "that visitation would be detrimental to the child." (§§ 366.21, subd. (h), 366.22. subd. (a), 3d par.) Similarly, during the reunification period, sibling visitation may be denied on a finding by the court, based on clear and convincing evidence, "that sibling interaction is detrimental to either child." (§ 362.1, subd. (a)(2).)

This strict legislative limitation on suspending or denying all parental visitation during the reunification period is no accident: Without visitation of some sort, it is virtually impossible for a parent to achieve reunification. (See *S.H., supra*, 111 Cal.App.4th at p. 317; see generally *Wagner v. Wagner* (2008) 162 Cal.App.4th 249, 258, fn. 6 [75 Cal.Rptr.3d 511] [" '[a] court construing

---

[5] In a number of situations—for example, if the child has been adjudicated a dependent as a result of severe sexual abuse or the infliction of severe physical harm (§ 361.5, subd. (b)(6))—reunification services, and with them mandatory parental visitation, will be ordered only if the court finds by clear and convincing evidence that reunification is in the best interest of the child. (§ 361.5, subd. (c), 2d par.)

a statute is not authorized to insert qualifying provisions or exceptions not included by the Legislature or to rewrite the statute to conform to some assumed intention that does not appear from its language' "].)

■ The record in this case reveals the juvenile court made extraordinary efforts to reconcile C.C.'s well-being with Lisa's interest in the "care, custody and companionship" of her child, repeatedly postponing the disposition hearing to allow further therapeutic assessment of the impact of visitation. This is most certainly not a case in which the court improperly delegated the power to grant or deny visitation to the child, as Lisa contends. (Cf. *S.H.*, *supra*, 111 Cal.App.4th at p. 317.) To the contrary, the court carefully considered the expert reports and testimony of not only C.C.'s therapist, Dr. Correa, but also Drs. Collister and Derman and the psychologist who reviewed Dr. Collister's report, as well as the reports from Lisa's own therapist and program managers. What is painfully clear from the record is Lisa so impaired the parent-child relationship during the first 10 years of C.C.'s life she is now left with the unenviable task of rebuilding it over the course of many years to come. Moreover, the court circumscribed its order by directing the issue to be revisited three months later at the 12-month review hearing. Presented with a seemingly intractable situation, the juvenile court directed the Department to suspend visitation pending future review hearings and additional therapeutic intervention. Were section 362.1, subdivision (a)(1)(B), to permit a suspension of visitation based on a finding of detriment to the child's overall well-being, we would certainly conclude the court's order was supported by substantial evidence.

It does not, however; and, notwithstanding the court's effort, we cannot tell from the record whether the court's reasoning was properly tethered to the statutory directive mandating parental visitation unless there exists substantial evidence of a threat to the child's safety. There is a reference in the record to Patrick's concern C.C. might harm himself, but this isolated reference does not appear to have been central to the court's reasoning. Nor is there any evidence in the record Lisa presented a threat to C.C.'s physical safety during monitored visitation in a therapeutic setting.

Having concluded the court applied an incorrect standard in making its visitation order at disposition, had visitation not been restored and jurisdiction terminated, we would remand for further findings in accordance with the correct statutory standard. No such remand is necessary under the circumstances here. However, to eliminate even the remote possibility of prejudice to Lisa arising from the adverse finding based on the incorrect standard, we reverse the visitation order of June 9, 2008. (See *Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 134 [41 Cal.Rptr. 468, 396 P.2d 924] ["Since the basis for that judgment has now disappeared we should 'dispose of the case, not

merely of the appellate proceeding which brought it here.' [Citation.] That result can be achieved by reversing the judgment solely for the purpose of restoring the matter to the jurisdiction of the superior court, with directions to the court to dismiss the proceeding."]; *Giles v. Horn* (2002) 100 Cal.App.4th 206, 229 [123 Cal.Rptr.2d 735]; see generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2008) ¶ 5:34, p. 5-15.)

## DISPOSITION

The June 9, 2008 order of the juvenile court denying visitation is reversed. In light of the subsequent order restoring monitored visitation and terminating juvenile court jurisdiction, no remand for further proceedings is necessary.

Woods, J., and Zelon, J., concurred.

A petition for a rehearing was denied May 12, 2009.