Filed 2/19/15  In re Stephanie C. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re STEPHANIE C. et al. Persons Coming Under the Juvenile Court Law. | B254476 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County  Super. Ct. No. CK97288) |
| Plaintiff and Respondent, | |
| v. | |
| MARISELA C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony Trendacosta, Judge.  Dismissed.

Lori A. Fields, under appointment by the Court of Appeal for Appellant.

Mark J. Saladina, County Counsel, Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

_____

Marisela C. (Mother) appeals from the juvenile court's dispositional order. Mother contends the evidence is insufficient to support the juvenile court's finding that her two daughters are dependents under Welfare and Institutions Code section 300, subdivisions (b) and (j).[1]  Because the juvenile court has terminated jurisdiction over the girls, we dismiss the appeal as moot.

## FACTS

Mother is a single mother to two girls, Stephanie C. (born 2003) and Genesis C. (born 2012).  Mother had an abusive relationship with her husband, Salvador C. (Father) and moved to Los Angeles from Chicago in 2005 to escape Father.  Father followed her to Los Angeles, where they reconciled.  He was subsequently deported for a parole violation and was in Mexico at all relevant times.

Mother met Karla G. at the park sometime in September 2012.  They became friends and met almost every day, either at the park or at Mother's home.  Although Karla had a strong personality, Mother considered her a friend and Karla was nice to her and her children.  Karla had a two-year-old son.  Mother knew Karla wanted to have a girl, but could not have any more children.  On several occasions, Karla offered to adopt Stephanie and Genesis, assuring Mother she could give them a better life since she and her husband owned a home and a business.  Mother believed Karla was joking.  Karla also often asked Mother for permission to take Genesis for a week, promising that she would see a difference when she returned.  Karla professed to love Genesis.  The girls had been alone with Karla twice prior to the incident in question—once at the park and once at Karla's home.

On January 7, 2013, Karla offered to take Stephanie and Genesis to Chuck E. Cheese along with her son.  They were gone from approximately 6:00 p.m. to 9:00 p.m. After Karla dropped off the girls, Mother noticed Genesis had numerous injuries. When asked for an explanation, Karla returned to Mother's apartment and denied

---

[1]     All further section references are to the Welfare and Institutions Code unless otherwise specified.

knowing what happened to Genesis, claiming that Genesis may have been hurt because Stephanie may have taken her down the slide at Chuck E. Cheese. Stephanie accused Karla of lying, denied harming Genesis, and began to cry. Karla asked Mother to call the police or social services if she believed something had happened to Genesis. Mother did not want to do that because she was afraid the children would be taken from her. Mother became alarmed when she noticed Genisis had a soft spot on the back of her head. She called the pediatrician, who advised her to use a light to see if Genesis' eyes tracked. She did so and Genesis just stared straight ahead with a "blank stare." Mother called her sister, Esther C., to help her. Esther's husband took them to the hospital. In addition to numerous visible injuries to her ear, hand, and head, it was discovered at the hospital that Genesis had fractures to her rib, a broken toe, and multiple lacerations and bruising inside her vaginal area which were consistent with physical and sexual abuse.

A section 300 petition was filed on January 11, 2013, containing allegations under subdivisions (a), (b), (d), (e), and (j). The petition alleged as follows: "On 01-07-13, seven-month old Genesis [C.] was medically examined, hospitalized and found to be suffering from a detrimental and endangering condition including a right parietal skull fracture with multiple branching fractures, a right rib fracture and a fracture to the fifth toe of the right foot. The child sustained a right cephalohematoma to the right temporaroparietal region, swelling to the scalp, bruises to the left cheek, extensive bruises and lacerations to the left ear, a laceration to the upper helix of the ear, scratches to the left thigh and scratches, bruises and lacerations to the left wrist and palm. The child sustained traumatic injuries from multiple impact sites. The child sustained bruising and lacerations [to] the child's hymen, numerous lacerations of the vestibule of the vagina and blunt force penetrating injuries and trauma to the vagina from a foreign object. The mother gave no explanation to the manner in which the child sustained the child's injuries. The child's injuries are consistent with inflicted trauma. Such injuries would not ordinarily occur except as the result of deliberate, unreasonable and neglectful acts by the child's mother, Marisela [C.], who had care, custody and control of the child. Such deliberate, unreasonable and neglectful acts on the part of the child's mother endangers

3

the child's physical health, safety and well-being, creates a detrimental home environment and places the child and the child's sibling Stephanie [C.] at risk of physical harm, damage, danger and sexual abuse."

Stephanie was placed in foster care while Genesis remained on hospital hold at Millers Children Hospital in Long Beach. The police were also contacted and began an investigation. During the subsequent investigation by the police and by Los Angeles County Department of Children and Family Services (DCFS), a somewhat consistent story emerged of what happened on January 7, 2013. That morning, Mother visited her sister with Genesis from 9:00 a.m. to 1:30 p.m. Neither Esther nor her children observed any marks or injuries on Genesis during that time. Esther's daughter showed the children's social worker (CSW) and the detectives pictures and a video she took of Genesis on January 6 and 7. Genesis appeared clean and neat without any marks or bruises on her face.

At 1:30, Mother left with Genesis to pick up Stephanie from school. She gave Stephanie a hamburger to eat and Genesis ate some fries. They then met Karla and her son at the park at approximately 4:30 p.m. Karla offered to bring Stephanie and Genesis to Chuck E. Cheese with her son. Mother stayed home. Stephanie and Karla both reported they first stopped at Karla's house to get a bottle for Genesis before going to Chuck E. Cheese. At Chuck E. Cheese, Genesis was sleepy and fussy. Karla admitted she told other people at Chuck E. Cheese that she adopted the girls because she felt like they were hers. Afterwards, they stopped again at Karla's house to use the restroom, where Karla took Genesis into her son's room to change his diaper. They then went to the drive-thru at McDonald's with Karla's husband. Karla dropped the girls off at home. Detectives viewed surveillance video at Chuck E. Cheese of Karla, her son, Stephanie, and Genesis entering at 5:30 p.m. and leaving approximately an hour later. They noticed nothing unusual in the video and none of the employees reported anything unusual happening.

4

When interviewed, Stephanie denied knowing how Genesis was injured. She stated Karla held Genesis in her arms the entire time they were at Chuck E. Cheese. However, she noticed Genesis appeared limp and weak and she was worried that Genesis was unusually quiet when she slept. When she repeatedly returned to check on Genesis, Karla encouraged her to play. Esther reported that Stephanie could be rough with Genesis, treating her like a three or four year old instead of a baby.

Mother denied abusing Genesis, believing Karla caused the injuries so she could adopt her. She said her children had no contact with anyone outside of the family and that she did not live with anyone besides her children. However, the CSW noted Mother had earlier admitted she shared a home with three other adults, but that these adults had no contact with the children. Mother took a polygraph test with no indication of deception.

The doctor noted that no prior injuries could be determined and that it was highly unlikely the injuries were caused by a child. However, it was evident that Genesis' injuries were intentionally inflicted and very painful. They could have occurred anytime during the 10 days prior to her admission to the hospital.

Karla denied that Genesis had any injuries when she brought her home. However, she reported that Genesis appeared dirty and smelled like vomit and urine that day. Genesis also appeared weak, tired, and malnourished at Chuck E. Cheese. Karla reported Mother had told her Genesis fell from the bed that day. A referral was generated with respect to Karla's two-year-old son for sexual abuse, physical abuse, and severe neglect. Karla stopped cooperating with the investigation after she retained an attorney.

At the detention hearing on January 11, 2013, the juvenile court found a prima facie case for detaining the girls had been established. Family reunification services were ordered as well as a multipdisciplinary assessment of the children and family, including psychological and physical assessments of the children.

In the combined jurisdiction/disposition report, DCFS recommended the juvenile court find Stephanie and Genesis to be children described under section 300, subdivisions (a), (b), (d), (e), and (j) and that the children be removed from Mother because there was

5

substantial danger to their physical health. DCFS also recommended Mother be provided monitored visits but not family reunification services. DCFS reasoned:

"The child Genesis was found suffering from several, painful fractures throughout her body, a burn mark on her hand and bite marks at only 7 months of age. Further, the child was exposed to additional pain by being sexually abused by a blunt object. The child's injuries were so significant that the child abuse specialist, Dr. Murray, concluded that the child is a battered child and has been tortured. The injuries have been noted as being acute and painful, to which mother has no explanation of how they could have occurred.

"Mother blames the family friend; Karla [G.] for the injuries that, according to mother, occurred while [Karla] took the children to Chuck E. Cheese. Mother denies any injuries prior to [Karla] picking up the children and the child Stephanie denies witnessing any injuries to the child while in the care of [Karla]. If mother is to be believed, the child sustained the severe physical and sexual injuries during a three hour period after mother allowed [Karla] to take the children. Mother has only recently befriended [Karla] and she allowed her to take a 7 month old child to Chuck E. Cheese without any care for the child's well-being. The children were out of mother's care for three hours and mother never bothered to contact [Karla] about the children even though it was late in the evening. Further, mother failed to seek the appropriate medical care for the child as she waited over three hours before taking the child to the hospital. Either the considerable injuries occurred at the hands of mother, or at the very least mother severely neglected the child by allowing [Karla] to take the children. And if it is the case that [Karla] was the perpetrator, then mother greatly failed to protect the child. Mother freely gave the child to [Karla] knowing that the child was going to a place not suited for young children. Moreover, mother made no attempt to go with [Karla] and mother's only excuse was because she wasn't invited. . . . Mother allowed a virtual stranger to take her children without her and upon the return of a visibly injured child delayed needed medical treatment."

6

By April 30, 2013, both girls had been placed with Esther, who was working with Stephanie to be gentler with Genesis. In addition, Mother had completed a 10 session parenting program and was participating in individual counseling. The DCFS referral as to Karla's child was closed as unfounded on April 11, 2013. The police submitted their case against Karla to the District Attorney's office for filing, but no action had been taken.

At the jurisdictional/dispositional hearing on August 23, 2013, Mother testified to the events described above. She believed Karla was a friend and met her almost every day at the park or at Mother's home. She did not have any concerns about Karla looking after her children because she felt Karla was a good mother to her son and she never did anything that caused Mother to be concerned. In September 2013, Karla took the girls to her house for three hours where they watched a movie. She also took them to the park to play with her son without Mother in December. Nothing unusual happened in either instance. Karla once gave Mother one hundred dollars to buy better diapers for Genesis, because Genesis had a severe diaper rash. Karla also gave Genesis clothes and blankets.

Although Karla and Mother were friends, Mother had never met Karla's husband or Karla's friends. Karla offered to adopt the children on two occasions but Mother believed she was joking. Mother testified that Karla regularly criticized her for being a weak person who allowed Stephanie to manipulate her. Karla encouraged Mother to "build character."

Carolina, Mother's niece, also testified at the hearing. Carolina recalled that Karla would call often and that would sometimes annoy Mother. She once witnessed Karla calling Mother four times during a visit to Carolina's house. Karla gave her "a bad vibe." She felt Karla was obsessed with Genesis and reported that Mother told her Karla was "brutal" while diapering her. She felt Mother was a good mother, who was concerned about her daughters and always tried to give them everything they needed.

In closing, County Counsel argued Mother should have known the children were at risk of grave injury when she allowed Karla to take them to Chuck E. Cheese. Mother knew Karla was obsessed with Genesis and had asked to adopt her and Stephanie.

7

Mother did not know which Chuck E. Cheese location they were going to, had set no time for the girls to come home, and never checked up on the girls while they were away. Further, Mother had a history of domestic violence with Father and her relationship with Karla, who also appeared controlling and manipulative, placed the children at risk. The children's attorney and Mother's attorney requested the juvenile court dismiss the petition on the ground there was no reason Mother could have suspected Genesis would be harmed by Karla.

The juvenile court found Mother to be neglectful and sustained the allegations under subdivisions (b) and (j) of section 300. In doing so, it noted that DCFS did not detain Karla's child, despite asserting Mother should have known Karla was abusive. However, the court found Mother to be "defensive" and that "some of her statements lacked credibility." The juvenile court expressly declined to sustain the allegations under subsection (e), which provides a child to be a dependent when "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." (§ 300, subd. (e).)

The juvenile court then continued the matter to receive an expert evaluation under Evidence Code section 730 prior to disposition. On June 5, 2013, the juvenile court ordered the evaluator to address the following issues: 1) the likelihood the girls would be abused by Mother; 2) Mother's ability to provide appropriate boundaries, supervision, and protection for the girls; 3) the nature of the sibling interaction between Stephanie and Genesis, particularly their physical interaction; 4) the girls' placement needs; and 5) therapy recommendations.

The evaluator described Mother as having "low self-esteem, to be prone to belittling herself and to have accepted the role of a weak, ineffectual and dependent person." Psychological testing indicated she was "a woman who is socially isolated, lacking in confidence and dependent on others. This would certainly be consistent with her decisions both to reconcile with a husband who was reportedly violent and abusive and to give in to the pressure of an overbearing 'friend' who was seeking access to her

8

children."  However, he did "not see her as a likely suspect with regard to her daughter's injuries.  There is no prior history of abusive behavior and no report of any unusual stressors on her or her family during the time that the injuries were sustained.  Moreover, both Stephanie and Karla expressed concern about Genesis' wellbeing while at Chuck E. Cheese, making it unlikely that the injuries occurred later that evening after they arrived home.  It is concerning, though, that [Mother] waited so long to get medical treatment for her daughter, once again depending on others to make important decisions."

The evaluator also eliminated Stephanie as a potential abuser since she "has no history of the kind of aggressive behavior and emotional disturbance that would be expected were she capable of so severely injuring her sister . . .  Although she was reported by family to be initially jealous of the attention her sister received and overly exuberant in her affection toward her sister, the degree of sibling rivalry appears within the normal range and not cause for great concern."  According to the evaluator, Karla appeared to be the most likely perpetrator, although he noted he had not been able to interview or assess her.

The evaluator concluded, "Even if we assume that Karla inflicted the injuries to Genesis, there remain serious questions about the mother's judgment in allowing her children to go with Karla that day and about her delay in seeking medical treatment for Genesis.  These judgment lapses and her attempt to reconcile with her husband despite his abusive and criminal behavior are definitely cause for concern with respect to her ability to provide a safe, abuse-free home environment, even if she herself has never behaved abusively toward her children.  The unresolved mystery about her daughter's potentially fatal injuries only increases this concern.  I, therefore, strongly recommend that her care of her children be closely monitored for as long as possible through intensive in-home services.  With close monitoring and support over at least the next six months, a clearer picture of her ability to protect her children will emerge."

Mother's counsel set the matter for a contested hearing after DCFS recommended Mother be provided with family reunification services.  On November 12, 2013, the juvenile court ordered overnight visits at Esther's home as well as unmonitored visits

during the day. Esther had indicated to DCFS that Mother could not live with them due to the small size of their home.

A contested dispositional hearing began on December 12, 2013. Mother testified that she has had therapy sessions and has learned to better take care of her daughters. In particular, she tries to spend more time with them rather than working as much as she used to. She also stated she was more aware of the people who come near her daughters. She never saw Karla again and would never consider starting a friendship with her again. Mother felt she "cannot trust anybody else." Mother also testified that she would allow Esther to take care of the children while she worked, but no one else.

The dependency investigator testified DCFS recommended overnight weekend visits and family reunification services for Mother and the children. While she believed Mother's judgment had changed significantly from the time Genesis was injured, it was not enough to demonstrate she could safely protect her children.

On January 31, 2014, the juvenile court declared the children dependents of the court under section 300 and released them to Mother's custody. Family maintenance services were ordered as well as individual counseling and parenting course for Mother. Mother was also ordered to complete a psychiatric assessment and to make the children available for unannounced home calls. Mother timely appealed.

## DISCUSSION

In this appeal, Mother challenges the juvenile court's jurisdictional findings. Mother contends she had no reasonable basis to believe that Karla would seriously physically and sexually abuse Genesis because Karla had cared for the girls twice before with no issues and Mother had observed Karla with her son over a long period of time. In short, "Karla's behavior may have been annoying or peculiar, but it would not have given a reasonable person cause to believe an infant would be *seriously abused* during an outing in a public place filled with adults and other children." In addition, there was no longer any risk Mother would make such a mistake again eight months after the petition was filed, at the adjudication hearing. As a result, Mother requested the juvenile court's adjudicatory findings be reversed and disposition orders vacated.

10

Subsequent to Mother's notice of appeal, however, the juvenile court terminated jurisdiction and granted sole legal and physical custody to Mother, with monitored visits with Father, by order dated October 30, 2014.[2] We requested supplemental briefing on this development from the parties on January 15, 2015. County Counsel submitted a letter brief urging us to dismiss on the ground Mother's appeal is moot. Mother disagrees, arguing the appeal is not moot because the juvenile court's findings would infect subsequent proceedings.

"As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. [Citation.] However, dismissal for mootness in such circumstances is not automatic, but 'must be decided on a case-by-case basis.' [Citations.] [¶] 'An issue is not moot if the purported error infects the outcome of subsequent proceedings.' [Citation.]" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488-1489 (*C.C.*); *see also In re Michelle M.* (1992) 8 Cal.App.4th 326, 330.)[3] In *C.C.*, the juvenile court found continued visitation with the mother to be detrimental to the child and suspended visitation in its disposition orders. (*C.C., supra,*

---

[2] On our own motion, we take judicial notice of the minute orders dated August 1, 2014 and October 30, 2014, issued by the juvenile court in this matter.

[3] The dissent relies on *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1547 (*Joshua C.*), for the proposition that an appeal is also not moot when the " 'alleged defect undermines the juvenile court's initial jurisdictional finding.' " (*Ibid.,* citing to *In re Kristin B.* (1986) 187 Cal.App.3d 596, 605.) It seems to us that this holding is appropriate only in situations where the outcome of the proceedings was adverse to the appellant. (*Joshua C., supra,* at p. 1548 [children placed with mother and appellant's visitation restricted]; *In re Kristin B., supra,* at p. 605 [parental rights terminated].) Indeed, the *Joshua C.* court explained, "The fact that the dependency action has been dismissed should not preclude review of a significant basis for the assertion of jurisdiction where exercise of that jurisdiction has resulted in orders which continue to adversely affect appellant. If the jurisdictional basis for orders restricting appellant's visitation with, and custody of, Joshua is found by direct appeal to be faulty, the orders would be invalid. Moreover, refusal to address such jurisdictional errors on appeal by declaring the case moot has the undesirable result of insulating erroneous or arbitrary rulings from review." (*Joshua,* at p. 1548.) Thus, we decline to apply the rule here, where Mother was granted custody of the girls and the outcome was not adverse to her.

11

at p. 1487.) After the mother's appeal, the juvenile court terminated jurisdiction and restored the appellant's right to visitation, the very relief she sought by her appeal. The appellate court rejected the mother's argument that the juvenile court's finding of detriment created the possibility of prejudice in subsequent family law proceedings, finding that concern to be "highly speculative." (*Id.* at p. 1489.) The court nonetheless considered the merits of her appeal "in an abundance of caution" and because the juvenile court's finding of detriment and visitation order were not made in accordance with the proper standard. (*Id.* at pp. 1483, 1489.)

Here, Mother retains custody of the girls and there is no effective relief we can grant her. Further, Mother's concerns regarding potential prejudice are similarly highly speculative. Mother contends she would be prejudiced by the juvenile court's findings: 1) "if the Department ever intervenes with the family again and another dependency action is filed[;]" 2) "if the children's father ever returns to southern California and attempts to regain custody of the children or modify the monitored visitation order[;]" and 3) if a report of child abuse is sent to the Child Abuse Central Index (CACI), which "may impact Mother if she seeks a license or employment in any field involving children (underscoring added)."[4]

Mother has failed to demonstrate how these "ifs" will ever become reality. It is undisputed Father has been deported to Mexico and has shown no inclination to regain custody. Father indicated to DCFS that he feels Mother is a good parent. Neither does Mother show she intends to or has sought employment in any field involving children, much less with an agency that would seek Mother's CACI file from the Department of Justice. Further, Mother has argued there is no risk of further neglect because she has learned from her parenting classes and psychotherapy. She also no longer trusts anyone

---

[4] The CACI is maintained by the Department of Justice, which is required to disclose such information it holds to any law enforcement or other agency that is conducting a child abuse investigation as well as certain agencies conducting background checks of applicants seeking employment involving contact with children. (Pen. Code, § 11170.)

12

besides her sister to take care of her children.  Thus, it is unlikely DCFS will need to intervene with this family again.

Even in the event of a future dependency proceeding, "a finding of jurisdiction must be based on current conditions.  [Citation.]  A past jurisdictional finding, particularly one based largely on a single instance of violence already [] years old, would be entitled to no weight in establishing jurisdiction, even assuming it was admissible for that purpose.  Instead, the agency will be required to demonstrate jurisdiction by presenting evidence of then current circumstances placing the minor at risk.  Other relevant dependency findings similarly would require evidence of present detriment, based on the then prevailing circumstances of parent and child.  The prospect of an impact on a family law proceeding is even more speculative."  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1494-1495.)

In contrast, the cases relied upon by Mother identify existing circumstances which would be impacted by the dispositional orders.  (*In re Christian I.* (2014) 224 Cal.App.4th 1088, 1096, fn. 6 [disposition order continued to adversely affect the mother because child placed with the father]; *Joshua C, supra,* 24 Cal.App.4th at p. 1548 [continuing case in family court could be affected]; *In re A.R.* (2009) 170 Cal.App.4th 733, 740 [the father's contact continued to be restricted]; *In re Hirenia C.* (1993) 18 Cal.App.4th 504, 517-518 [issues remained "live" controversies because an appeal taken from adoption decree].)  In other cases cited by Mother, the appellate court, like the court in *C.C.,* exercised its discretion to consider the matter on the merits although the matter was moot.  (*In re Daisy H.* (2011) 192 Cal.App.4th 713; *In Marquis H.* (2013) 212 Cal.App.4th 718.)  We decline to do so.

### DISPOSITION

The appeal is dismissed.


BIGELOW, P.J.

I concur:

GRIMES, J.

13

**FLIER, J., Dissenting**

Because I would not dismiss mother's appeal as moot, I respectfully dissent. Moreover, in considering the merits of the appeal, I find substantial evidence does not support jurisdiction over the children.

### 1. *The Appeal Is Not Moot*

The majority recognizes that a dismissal for mootness is not automatic and we must consider each appeal on a case-by-case basis. (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) Termination of jurisdiction does not render an appeal moot if the appellant would suffer future unfair consequences as a result of the underlying order. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716; see *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548.) Further, an appeal is not moot when "'the alleged defect undermines the juvenile court's initial jurisdictional finding.'" (*In re Joshua C., supra*, at p. 1547.) Because dismissal of the appeal operates as an affirmance of the underlying order, the "refusal to address such jurisdictional errors on appeal by declaring the case moot has the undesirable result of insulating erroneous or arbitrary rulings from review." (*Id.* at p. 1548; see *In re C.C., supra*, at p. 1489.)

Here, the defect that mother identifies undermines the court's basis for asserting jurisdiction over the children in the first place. As I discuss in part 2 of my dissent, I believe the court erred, and to dismiss the appeal as moot insulates its erroneous jurisdictional order from review. Even if mother has retained custody of the children and the juvenile court has terminated jurisdiction, the erroneous assertion of jurisdiction carries the potential for adverse consequences to mother, such as in future family law proceedings or dependency proceedings. The majority dismisses mother's concerns regarding future prejudice as "highly speculative" and stresses that mother has not shown how her concerns will ever become a reality. True, there is no present indication that father will return to the United States and commence a family law proceeding for custody of the children. Nor is there a present indication that the Los Angeles County Department of Children and Family Services (DCFS) will commence another

dependency proceeding.  But it is equally speculative to say these things will *never* happen.  We cannot know for sure either way.  The possibility that mother could suffer future unfair consequences as a result of the erroneous order is enough to consider the merits of the appeal "in an abundance of caution," as the court did in *In re C.C.*  There, the court thought the mother's concerns about future prejudice were "highly speculative," but it nevertheless considered the merits "to avoid any possible collateral prejudice," and the court ultimately reversed the underlying order.  (*In re C.C., supra*, 172 Cal.App.4th at pp. 1483, 1489, 1492-1493.)

The majority suggests the court's jurisdictional finding cannot prejudice mother in future dependency proceedings because the court must base any later finding of jurisdiction on current conditions.  I agree insofar as Welfare and Institutions Code section 300[1] generally requires proof of existing harmful conditions at the time of the jurisdictional hearing, but past events may be probative of existing conditions when there is reason to believe the past events might continue.  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.)  In this very case, DCFS argued at the jurisdictional hearing that the court should consider past events. County counsel urged the court "to look at the big picture and look at mother's history . . . in that mother lived in a very violent domestic-violence relationship . . . ." Mother's counsel objected to this argument.  The court overruled the objection and replied:  "Well, whether it's in the petition or not, the court can look at past acts.  That's what *Rocco M.* talked about."  County counsel then continued to argue the court should "look at mother's past" and her involvement with a violent and manipulative man as evidence of a "pattern of neglect."

Regardless of whether the court may rely on past events to assert jurisdiction, it seems dubious to say that a history of dependency proceedings will not affect future proceedings at all.  DCFS's reports for the court, which the court often receives into evidence, contain a section for prior child welfare history where the agency may report

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

on any prior dependency proceedings.  This section will inform DCFS's recommendations and the court's decisions, whether it is intended to or not.  In short, I would not find the appeal moot and would consider it on the merits, which I proceed to do in the following part.

*2.  Jurisdiction Is Not Supported by Substantial Evidence*

**a.  Applicable Law and Standard of Review**

The juvenile court made its jurisdictional findings under section 300, subdivisions (b) and (j).  Under subdivision (b) of section 300, a court may declare a minor a dependent of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . .  The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."  The three elements for a section 300, subdivision (b) finding are "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the [child], or a 'substantial risk' of such harm or illness."  (*In re Rocco M., supra*, 1 Cal.App.4th at p. 820.)  Exercise of dependency court jurisdiction under section 300, subdivision (b), is proper when a child is "of such tender years that the absence of adequate supervision and care poses an inherent risk to [his or her] physical health and safety."  (*In re Rocco M., supra*, at p. 824.)

Under subdivision (j) of section 300, dependency jurisdiction is proper when "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions.  The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other

3

factors the court considers probative in determining whether there is a substantial risk to the child."

"At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300. Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence. Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300." (§ 355, subd. (a).)

We review the juvenile court's jurisdictional order for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574.) Substantial evidence is relevant evidence which adequately supports a conclusion; it is evidence which is reasonable in nature, credible and of solid value. (*Id.* at p. 575; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court. We adhere to the principle that issues of fact, weight, and credibility are the provinces of the juvenile court. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

**b. Analysis**

Here, the court asserted jurisdiction under section 300, subdivision (b) based on a finding that Genesis suffered or was at a substantial risk of serious physical harm as a result of mother's neglect. Mother contends there was no indication that Karla had the potential to be seriously abusive to an infant. DCFS argues substantial evidence supports a finding that mother failed to adequately supervise and protect Genesis from Karla.

To support jurisdiction, there must be substantial evidence of "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the [child], or a 'substantial risk' of such harm or illness." (*In re Rocco M., supra*, 1 Cal.App.4th at p. 820.) One of the specified forms of neglectful conduct is a parent's negligent failure to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left. Thus, substantial

4

evidence must show mother was negligent in failing to adequately protect Genesis from Karla.

In making its ruling, however, the juvenile court expressly declined to find mother knew or reasonably should have known that Karla would injure Genesis. Without a finding that mother knew or reasonably should have known Karla would harm Genesis, I do not see how mother could be found negligent in entrusting Genesis to Karla. It is not as if Karla was a stranger or unfamiliar with young children, having a two-year-old son of her own. Mother knew Karla for at least four months prior to this incident. During this time, mother and Karla met nearly *every* day at mother's home or the park. I reject the notion that leaving a child in the care of a trusted friend, even a child as young as Genesis, should subject the child to the jurisdiction of the dependency court. There was no substantial evidence to support the juvenile court's finding of jurisdiction based on neglect in entrusting Genesis to Karla.

Moreover, I am not persuaded mother's delay in taking Genesis to the hospital constitutes substantial evidence of neglect. Genesis was with Karla until approximately 9:00 p.m. and was taken to the hospital sometime after midnight. Mother did not sit idly by during these three hours. When Genesis first arrived home, she was asleep with a hat on her head. Shortly thereafter, Genesis began to cry and become fussy. Mother initially noticed a strange cut on Genesis's hand and a severely bruised left ear. She called Karla for an explanation, and Karla came to mother's home. Later, when mother removed Genesis's hat, she noticed an injury to her head. When Genesis's eyes failed to track, mother called Esther for help and took Genesis to the hospital. Given these facts, I cannot say mother was negligent when she did not take Genesis to the hospital immediately.

Even if mother's delay constituted neglectful conduct, to support jurisdiction there must also be causation (*In re Rocco M., supra*, 1 Cal.App.4th at p. 820), and I see no evidence of causation of harm. There is no indication that the three-hour delay in taking Genesis to the hospital caused her injury in and of itself. The record of her doctor's examination 15 days after the incident describes her as "well appearing, no acute distress,

5

[and] playful." By that time, most of her injuries had resolved or were in the process of healing. Nothing indicates Genesis did not make a full recovery or that the delay in taking her to the hospital impeded her recovery.

I am further persuaded by the reasoning *In re Savannah M., supra*, 131 Cal.App.4th 1387, a factually and procedurally similar case. In *In re Savannah M.*, the parents left 19-month-old twins in the care of a family friend. David was a 60-year-old father of seven whom the father had met at work two years earlier. David and his girlfriend had looked after the twins on two prior occasions without incident. The parents left for 20 minutes to buy milk, diapers, and beer. When they returned, they found David changing their daughter's diaper. They found it strange because he had previously told them he never changed diapers and the parents had changed the baby's diaper before they left. Despite their misgivings, the parents again left the children alone with him later that evening. When they returned 30 minutes later, they discovered him sexually molesting one of the twins. The juvenile court declared the twins children described by subdivisions (b) and (j) of section 300 and placed them in the home of their maternal grandmother. (*In re Savannah M.*, at pp. 1390-1391.)

On appeal, the court concluded substantial evidence did not support a finding that the twins were at substantial risk of future serious physical harm. The court reasoned, "[d]espite their suspicions of David, without clearer evidence of David's sexual or other wrongful intentions as to [the child], Mother and Father, or any 'reasonably aware' parent in their position, would not be required to be prescient or hypervigilant. Absent such clearer evidence of wrongful intent, reasonable parents should be permitted to trust, and have faith in, a family friend they have known for two years who had otherwise never given them any reason to doubt his good intentions toward their or other children." (*In re Savannah M., supra*, 131 Cal.App.4th at p. 1396.) Upon discovering David sexually abusing their daughter, they summarily ejected him from their home, and the mother confirmed she would never trust David or anyone else to care for her daughters. "Although Agency does not (and could not reasonably) argue Mother and Father would ever allow David to care for their daughters in the future, Agency argues Mother and

6

Father, especially in light of their alcohol use, might allow another person like David to manipulate them into caring for their daughters. However, that argument is mere speculation and is unsupported by reasonable inference from the evidence at the time of the January 5, 2005 hearing." (*Id.* at p. 1397.)

Likewise, mother has indicated she has no intention of allowing anyone other than her immediate family to look after the girls. She also testified she had not seen Karla again and would never resume a friendship with her. Mother was remorseful and indicated she was willing to learn from her mistake. By the time of the jurisdiction hearing, mother had completed a parenting course and her daily visits with the children were going well. There is no evidence to indicate Genesis faced a risk of harm in the future.

Because I find substantial evidence does not support jurisdiction over Genesis under section 300, subdivision (b), jurisdiction is also not supported as to Stephanie under subdivision (j). (*In re Savannah M., supra*, 131 Cal.App.4th at p. 1399.) I would reverse the court's jurisdictional finding over Genesis and Stephanie and remand with directions to dismiss the petition.


FLIER, J.


7