Filed 5/30/25  In re C.V. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re C.V. et al., Persons Coming Under the Juvenile Court Law. | B336483 |
| | (Los Angeles County Super. Ct. No. 24CCJP00632A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CARLOS V., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Natalie Nardecchia, Judge.  Affirmed in part and dismissed as moot in part.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

———————————

## INTRODUCTION

Father Carlos V. appeals from the juvenile court's jurisdiction findings and disposition order declaring his three children dependents of the court pursuant to Welfare and Institutions Code section 300, subdivisions (b)(1), (d), and (j), and removing them from his custody following allegations of sexual abuse by Carlos of his four-year-old daughter R.V.[1] Carlos contends the juvenile court's jurisdiction findings are based on uncorroborated and unreliable hearsay statements by R.V. and are not supported by substantial evidence. Carlos also challenges the sufficiency of the evidence supporting the juvenile court's removal of the children from his custody. While this appeal was pending, the juvenile court terminated jurisdiction with an exit order awarding sole physical custody to the children's mother, Alexandra. We affirm the jurisdiction findings pursuant to section 300, subdivisions (d) and (j), and dismiss Carlos's appeal from the disposition order as moot.

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

A.     *The 2024 Referral and Initial Investigation*

Carlos and Alexandra are the parents of daughter R.V. (born 2019) and twins C.V. and G.V. (born 2018).  Carlos is a stay-at-home parent and Alexandra largely works from home.

The Los Angeles Department of Children and Family Services (Department) received a referral on January 17, 2024 alleging sexual abuse of R.V. by Carlos.  The referral alleged R.V. began crying while using the restroom at school where she attended pre-kindergarten, while accompanied by a staff member, and said she missed her father.  The staff member told R.V. to wipe herself and pull up her underwear, and that her father would soon arrive to pick her up.  R.V. continued crying and told the staff member that her father likes to look at her vagina.  The staff member asked if he did it when R.V. "[was] done" with going to the bathroom, and R.V. said, "No, he likes to lick it with his tongue."  Another staff member then asked R.V. about it but R.V. would not say anything and looked away.  A third staff member asked R.V. about it, and R.V. repeated what she told the first staff member.  When asked where the conduct happens, R.V. stated it happens at home, and when asked, "Do you do anything to him?" she said, "No, he gives me a doll.  I tell him to stop, I say 'No' and he says, 'Yes.'"  R.V. did not know the date of the incident, how often it occurred, or if her mother was aware of the situation.

A social worker visited the family home the same day and spoke to both parents.  Alexandra said the allegations against Carlos were "impossible" and that she uses proper terminology with the children and has open conversations about not letting

3

anyone touch them.  Alexandra stated R.V. got rashes from not wiping well, and the allegations could be from Carlos touching her to put cream on her rash.  Alexandra said she works at home and rarely leaves.  She said R.V. was seen by a doctor the prior week due to a methicillin-resistant Staphylococcus aureus (MRSA) pimple on her upper thigh.

Police arrived and two officers (one male, one female) spoke with R.V., with her maternal grandmother D.M. in the room. R.V. initially said she did not remember what happened at school, but after the male officer stepped out of the room, R.V. said her daddy licked her vagina with his tongue and giggled. R.V. said she cried when it happened, and that he gave her a toy. R.V. said it happened in her mother's room and that her mother was on a Disney cruise when it happened.  D.M. said everyone was on the Disney cruise together.  Carlos was arrested.  R.V. and the twins each told the social worker they felt safe with both parents and had not been made to do something they were not supposed to do.  D.M. stated she was shocked at the amount of detail R.V. shared and that she had never seen Carlos being inappropriate.

Alexandra stated it was frustrating to be asked not to discuss the allegations with the children prior to a forensic interview.  She stated R.V. had just lied to her about who turned on the fan.  Alexandra stated she knew Carlos did not do anything inappropriate and R.V. was lying.

B.    *R.V.'s Forensic Interview*
Two days later, a specialist at a child advocacy center conducted a forensic interview of R.V.  The day before the interview, Alexandra expressed frustration to the social worker

4

about the investigation and stated that R.V. made up stories. When the social worker said it was highly unlikely for a child R.V.'s age to fabricate sexual abuse with that level of detail, Alexandra replied, "Unless you're [R.V.]."

At the interview, the interviewer explained to R.V. that her job was "to listen to kids talk about all kinds of things that have happened" and find out if she is safe and healthy. R.V. then spontaneously said she eats all the vegetables. The interviewer explained that R.V. could say "I don't know" or "I don't know what you mean" if she does not know the answer to a question and could correct the interviewer if the interviewer made a mistake. To practice, the interviewer asked R.V. if R.V. was 30 years old, and asked, "Did I make a mistake?" and R.V. said, "Yep." R.V. then counted on her hands to four and stated she was "like this," and "going to five after."

The interviewer told R.V. she would ask her questions, R.V. could "use whatever words you need to when you're in here," and the most important thing was that R.V. tell the truth. R.V. said she knew letters and began to say the alphabet. The interviewer asked R.V. if she promises to tell the truth, and R.V. said, "I don't know the truth." The interviewer explained that the truth means something that really happened and asked her if she would tell things that really happened. R.V. apparently made a nonverbal gesture for "yes," and the interviewer asked R.V. to use her words and asked, "when you go like this, does—what does that mean?" R.V. replied, "Yes."

After some general questions about toys, R.V. spontaneously said, "So my dad likes licking my vagina." The interviewer asked R.V. to "tell me everything about that. You said your dad likes licking your vagina." R.V. responded, "Isn't

that funny?" R.V. said it happened at home. When asked what part of the home, R.V. said that she did not know. R.V. said there is a bed. When asked what room she was in, R.V. said she was in "my mom's room." When asked about the bed, R.V. said, "And my—I all covered in the blanket and then my dad covered from my—my legs and then—then now he lick my vagina." The interviewer repeated, "You said your dad covered your legs right here, and you pointed to this part of your legs and down, and then you said he licked your vagina. Did I get that? Did I make a mistake?" R.V. nonverbally indicated there was a mistake, and clarified: "So, my dad was licking my vagina and he just covered one [leg]." The interviewer asked what her father did with her clothes, and R.V. said that he threw them away because "it had poop on them." R.V. stated she had on a bathing suit that was "just for licking. . . . (Unintelligible) my vagina." R.V. said that she was standing on a bench when this occurred. When the interviewer said "bed," R.V. corrected her and again said it was on a bench—"You got it wrong." R.V. said her father "was like laying and then he go under me and then he did that."

R.V. initially said she did not know what "licking" was. The interviewer asked R.V. "what did he use on your vagina" and R.V. said, "Uh, a paintball gadget." Later the interviewer asked, "What did he lick your vagina with?" and R.V. answered, "His tongue." The interviewer asked R.V. to tell her what licking means, and R.V. said, "The licking means when you lick food."

The interviewer asked R.V. what she said when her dad was licking her vagina, and R.V. stated, "I said no." She said her dad then gave her a toy. The interviewer asked how it made her feel when that was happening, and R.V. said, "Uh, it hurt and then I pull and twist and then I run away from him. He was

6

trying to catch me." When the interviewer repeated, "I think I heard you say it hurt," R.V. apparently nonverbally indicated agreement; the interviewer then said, "And then you ran?" and R.V. replied, "Oh, no, you made a mistake." R.V. then said, "He has a spoon." When asked how many times the licking happened, R.V. said, "One time." R.V. said she told her mom about this. When asked what her mom said, R.V. said, "Um, her said I will tell my dad a lesson."

C.    *Additional Investigation*

On January 22, 2024, J.H., Alexandra's sister-in-law, told the social worker that she was playing with R.V. over the weekend and R.V. said her "dad" licks her vagina. J.H. said R.V. usually refers to Carlos as "daddy" not "dad." J.H. asked R.V. if "dad" was "daddy," and R.V. said "it's nino (Godfather)."

On January 25, R.V.'s teacher Ms. K. told the social worker the following conversation occurred:

R.V.:  I miss my dad[.]
Ms. K.:  He will be picking you up shortly[.]
R.V.:  My dad kisses me[.]
Ms. K.:  He kisses you because he loves you[.]
R.V.:  He looks at my vagina[.]
Ms. K.:  To clean it[.]
R.V.:  He licks my vagina[.]

Ms. K. said R.V. repeated this to another staff member. That staff member asked R.V. what she tells daddy when he does that and that R.V. said she tells him no and he says yes.

R.V.'s medical records from January 10, 2024 documented MRSA cellulitis on her left thigh. R.V.'s medical records dated

January 23, 2024 documented redness and rash around the buttock and vaginal area for two days, "painful irritation of vulvar and perianal area with poor hygiene, no dysuria," and a diagnosis of vulvovaginitis.[2]

On January 29, Alexandra called the social worker and said R.V. had told her "Nino touched my vagina," and repeated "Nino Frankie [her godfather and maternal uncle] touched my vagina." At a follow-up forensic interview two days later with the social worker, Alexandra, and a detective present, R.V. did not want to answer any questions but indicated that "dada" was uncle and "nino" was brother. During the follow-up forensic interview, Alexandra stated she believed the allegations could be a confusion as to the person who did it.

R.V. had a medical exam on January 30, 2024, with normal genital and anal findings. During the exam, R.V. said she did not fear anyone and that no one is trying to hurt her. She later said, "My daddy likes to lick my vagina." She said it happened on more than one occasion and that her siblings were at the beach. She said it occurred on "Mommy's bed."

On February 9, 2024, the district attorney informed the Department it would not pursue a criminal case against Carlos.

---

[2]     "Vulvovaginitis in toddlers is the inflammation or swelling of their vulva and vagina. Symptoms include redness, soreness and itching in your child's vaginal area. The most common cause of vulvovaginitis in toddlers are irritants such as harsh soaps, bubble baths and tight-fitting clothing. Treatment typically involves eliminating the irritants." (<https://my.clevelandclinic.org/health/diseases/22488-vulvovaginitis-toddler> [as of May 28, 2025].)

D. *Section 300 Petition and Further Investigation*

On February 22, 2024, the Department filed an application to remove the children from Carlos. The juvenile court authorized removal of the three children the next day.

On February 27, 2024, the Department filed a dependency petition pursuant to section 300, subdivisions (b), (d), and (j), regarding the three children. The Department alleged that Carlos sexually abused R.V.; Alexandra knew or reasonably should have known of the sexual abuse and failed to protect R.V.; and R.V., C.V. and G.V. were at risk of harm.

At the initial hearing, the court detained the children from Carlos and released them to Alexandra. The court ordered monitored visits for Carlos.

In April 2024, the investigator attempted to interview R.V., but R.V. was resistant; she stated she felt safe with her parents but did not want to sit and talk to the investigator. Alexandra told the investigator she did not believe that Carlos committed the act, and she felt comfortable allowing Carlos to see the children after the district attorney rejected the case. She said she and Carlos were on a break and focusing on the children. Alexandra said that although a bench was mentioned, she does not have a bench. Alexandra said perhaps R.V. saw something that she should not have, such as the parents' activity; Alexandra watched pornography at times so maybe R.V. "saw something." She described R.V. as a "storyteller" and said R.V. told a lady at school that her mother is pregnant and got pregnant on the Disney cruise.

E.    *Jurisdiction and Disposition Hearing*

On April 5, 2024, the juvenile court held a combined jurisdiction and disposition hearing.  Counsel for Carlos, counsel for the children, and counsel for Alexandra requested that the petition be dismissed.  The court sustained the petition as pleaded.

The court stated R.V. was "very consistent" and told two different teachers that her father licked her vagina.  The court noted that when R.V. was with the police officers, R.V. told the female officer that her father always licks her vagina with his tongue.  The court also stated that R.V. said she did not want him to lick and then she cries and he gives her toys.  The court noted that R.V. spontaneously told the forensic interviewer, "My dad likes licking my vagina," and said it happened at home in her mom's room.  The court stated that R.V. said she told her mother and that her mother said she would give her dad "a lesson."  The juvenile court cited *In re Cindy L.* (1997) 17 Cal.4th 15, noting the California Supreme Court provided a list of factors to consider in determining credibility.  (See *id.* at pp. 29-30 ["nonexhaustive list of factors" includes "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate"].)  The juvenile court did not find credible Alexandra's statement that R.V. told her that her "nino" "touched" her vagina, noting that R.V. did not use the word "touch" with anyone else.  The court found that Alexandra failed to protect R.V. based upon R.V.'s statements telling her mother that her father licked her vagina, and that Alexandra said she would, "[t]ell my dad a lesson."  The court found that the children were as described by section 300, subdivisions (b)(1), (d), and (j).

10

The juvenile court proceeded to disposition. The court declared the children dependents of the court and removed them from Carlos's custody, based on the finding that Carlos engaged in sexual abuse of R.V. The court placed the children with Alexandra and ordered family maintenance services and monitored visits for Carlos. Carlos was ordered to participate in individual counseling and sexual abuse awareness counseling for perpetrators, and conjoint counseling with the children if recommended by the children's therapists.

Carlos timely appealed from the jurisdiction findings and disposition order. Alexandra did not appeal and is not a party to this appeal.

F.    *Termination of Jurisdiction and Exit Orders*

In October 2024, while this appeal was pending, the juvenile court terminated jurisdiction with a custody and visitation order (commonly known as an "exit order") granting Alexandra sole physical custody of the children, granting Alexandra and Carlos shared legal custody, and ordering unmonitored visits for Carlos conditioned on his continued participation in his court-ordered counseling and sexual abuse perpetrator programs. Carlos did not appeal from the termination of jurisdiction and exit orders.

11

## DISCUSSION

A. *We Exercise Our Discretion To Reach the Merits of Carlos's Appeal from the Jurisdiction Findings, but not His Moot Appeal from the Disposition Order*

In dependency proceedings, an appeal "becomes moot when events """render[ ] it impossible for [a] court, if it should decide the case in favor of [the appellant], to grant him any effect[ive] relief."""" (*In re D.P.* (2023) 14 Cal.5th 266, 276; accord, *In re Gael C.* (2023) 96 Cal.App.5th 220, 264; *In re Damian L.* (2023) 90 Cal.App.5th 357, 369.) "An order terminating juvenile court jurisdiction generally renders an appeal from an earlier order moot." (*In re Rashad D.* (2021) 63 Cal.App.5th 156, 163; see *In re G.Z.* (2022) 85 Cal.App.5th 857, 874; *In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) But "when a juvenile court's finding forms the basis for an order that continues to impact a parent's rights—for instance, by restricting visitation or custody—that jurisdictional finding remains subject to challenge, even if the juvenile court has terminated its jurisdiction. [Citations.] Because reversal of the jurisdictional finding calls into question the validity of orders based on the finding, review of the jurisdictional finding can grant the parent effective relief." (*D.P.*, at pp. 276-277; see *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431-1432; *In re A.R.* (2009) 170 Cal.App.4th 733, 740.)

Here, the jurisdiction findings were the bases of the custody and visitation order that gave Alexandra sole physical custody of the children and conditioned Carlos's unmonitored visits on completion of a sexual abuse program for perpetrators and individual counseling. Although Carlos's visitation was liberalized from monitored to unmonitored in the exit order

12

(presumably based on maintaining positive visits), the continuation of his court-ordered case plan and grant of sole physical custody to Alexandra flowed directly from the juvenile court's original jurisdiction findings. But because Carlos did not appeal from the juvenile court's order terminating its jurisdiction and from the custody and visitation order, his appeal is moot. (See *In re Gael C., supra,* 96 Cal.App.5th at p. 225 ["'in most cases . . . for this court to be able to provide effective relief, the parent must appeal not only from the jurisdiction finding and disposition order but also from the orders terminating jurisdiction and modifying the parent's prior custody status'"]; *In re Rashad D., supra,* 63 Cal.App.5th at p. 164 ["to the extent an appellant argues, as here, that the challenged jurisdiction finding resulted in an adverse juvenile custody order . . . , an appeal from the orders terminating jurisdiction and awarding custody is necessary"].) Additionally, "where jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot." (*In re D.P., supra,* 14 Cal.5th at p. 283).

Carlos requests that we exercise our discretion to decide his moot appeal because of the pernicious nature of "a finding that the parent sexually abused his . . . child," a request the Department does not oppose. A reviewing court has "'inherent discretion'" to reach the merits of an appeal even where the case is moot. (*In re D.P., supra,* 14 Cal.5th at p. 282.) We decide on a case-by-case basis whether to reach the merits of a moot appeal, and among the factors we may consider are "whether the jurisdictional finding is based on particularly pernicious or stigmatizing conduct." (*Id.* at pp. 285-286.) The "more egregious

13

the findings against the parent, the greater the parent's interest in challenging such findings." (*Id.* at p. 286.)

We exercise our discretion to reach the merits of Carlos's appeal from the jurisdiction findings.[3] Here, the substantiated finding of sexual abuse of a four-year-old child constitutes "particularly pernicious or stigmatizing conduct," and the egregious nature of the findings give Carlos a great interest in challenging such findings (*In re D.P., supra,* 14 Cal.5th at pp. 285-286; accord, *In re L.O.* (2021) 67 Cal.App.5th 227, 237; *In re M.W.* (2015) 238 Cal.App.4th 1444, 1452), particularly because the district attorney did not pursue criminal charges. (Cf. *In re D.P.*, at p. 285 ["dismissal of an appeal for mootness . . . may '"ha[ve] the undesirable result of insulating erroneous or arbitrary rulings from review"'"].)

We decline to exercise our discretion to decide Carlos's appeal from the disposition order removing the children from his custody. Reversing the disposition order would not provide Carlos any effective relief; it was not the basis for the custody and visitation order and he would still be bound by the custody and visitation order because he did not appeal it. The juvenile court's exit orders superseded the prior disposition order. (See *Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1165 ["the exit order 'shall be a final judgment and shall remain in effect after [the juvenile court's] jurisdiction is terminated'"]; see also § 362.4,

---

[3]     As explained in the following section, we conclude substantial evidence supports the jurisdiction findings. Accordingly, because we affirm, we need not reach the question of what the appropriate remedy would be if we were to exercise our discretion to consider a moot appeal and conclude that substantial evidence did not support the jurisdiction findings.

14

subd. (b) [custody and visitation orders "continue until modified or terminated by a subsequent order of the superior court"].)  An exit order is a final judgment and is not subject to collateral attack through an appeal from a previous disposition order.  (See § 302, subd. (d) ["Any custody or visitation order issued by the juvenile court at the time the juvenile court terminates its jurisdiction . . . shall be a final judgment and shall remain in effect after that jurisdiction is terminated."]; see also *Heidi S.,* at p. 1165.)  But Carlos is not without a remedy.  Under section 302, subdivision (d), he may seek modification of the exit orders in family court if he can "demonstrate 'there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child.'"  (*In re Rashad D., supra,* 63 Cal.App.5th at p. 165, fn. 7.)

B.     *Substantial Evidence Supports the Juvenile Court's Jurisdiction Findings*

1.     *Governing Law and Standard of Review*

Section 300, subdivision (d), provides the juvenile court may adjudge a child a dependent of the court if "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent."[4]  As relevant here, sexual

---

[4]     "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged

15

abuse includes "[s]exual contact between the genitals or anal opening of one person and the mouth or tongue of another person." (Pen. Code, § 11165.1, subd. (b)(2); see *In re Mariah T.* (2008) 159 Cal.App.4th 428, 439.) Section 300, subdivision (j), provides the juvenile court may adjudge a child a dependent of the court if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

"In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings . . . , we 'consider the entire record to determine whether substantial evidence supports the juvenile court's findings.' [Citations.] 'Substantial evidence is evidence that is "reasonable, credible, and of solid value," such that a reasonable trier of fact could make such findings.'" (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; accord, *In re J.S.* (2021) 62 Cal.App.5th 678, 685.) In reviewing for substantial evidence, "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 640; see *In re Nathan E.* (2021) 61 Cal.App.5th 114, 122 ["'In making [a substantial evidence] determination, . . . we note that issues of fact and credibility are the province of the trial court.'"].) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206; see *In re J.S.*, at p. 685.)

---

statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773-774.) Subdivisions (d) and (j) of section 300 are the most relevant here.

16

2.  *Substantial Evidence Supports the Juvenile Court's Jurisdiction Findings*

Carlos contends substantial evidence did not support the court's jurisdiction findings. We conclude there was substantial evidence supporting the court's findings under section 300, subdivision (d), that Carlos sexually abused R.V. and, under subdivision (j), that R.V.'s siblings were at substantial risk of abuse.

R.V. told multiple school staff members, police officers, and social workers that her father "licked" her "vagina." During her subsequent forensic interview, R.V. again stated her father licked her vagina, and indicated she knew what and where her vagina was. She knew that licking happened with his tongue. She repeated multiple times that she said "no," and that it happened in her mom's room. Based on this evidence, the court could reasonably conclude that, based on R.V.'s statements, Carlos had sexual contact between his tongue and R.V.'s genitals. (See Pen. Code, § 11165.1, subd. (b)(2); see also *In re Carlos T.* (2009) 174 Cal.App.4th 795, 804 [substantial evidence supported the juvenile court's finding of sexual abuse where the child said his father "'play[ed] with [his] front private part'" multiple times and touched his "'butthole'"]; *In re P.A.* (2006) 144 Cal.App.4th 1339, 1344 [substantial evidence supported the juvenile court's jurisdiction findings where, "although [the child's] accounts of [her] father's abuse varied in the details, each account related essentially the same two incidents"].) The same evidence supports the court's findings under section 300, subdivision (j), that R.V.'s five-year-old twin siblings, of similar age to her, were at substantial risk of abuse based on Carlos's abuse of R.V.

17

R.V. was sometimes reluctant to describe what happened, and her account varied from "bed" to "bench," among other details. But it was up to the juvenile court to determine R.V.'s credibility and what weight to give her statements in light of her age and certain inconsistencies in her statements. (See *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court."]; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 199 ["an appellate court defers to the trier of fact . . . and has no power . . . to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence"].) Further, absolute consistency in a child's account of sexual abuse is not required to support a jurisdiction finding. (See *In re I.C.* (2018) 4 Cal.5th 869, 896 ["A child's account may reflect uncertainty, and may even contain some contradictions, and nevertheless warrant the court's trust."].) It is not enough that a different factfinder may have made a contrary finding. (See *In re B.D.* (2021) 66 Cal.App.5th 1218, 1225 [we "will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists"]; *In re J.N.* (2021) 62 Cal.App.5th 767, 774 ["'we do not consider whether there is evidence from which the dependency court could have drawn a different conclusion but whether there is substantial evidence to support the conclusion that the court did draw'"].)

Carlos argues there is not substantial evidence to support the court's jurisdiction findings because the sole evidence of sexual abuse "arises from unsworn statements made by R.V." Carlos argues that "[m]ere uncorroborated hearsay does not

18

constitute substantial evidence" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 689), and that due process "requires a showing that "'the time, content and circumstances of the statement provide sufficient indicia of reliability'" before a juvenile court may rely exclusively on such a statement in making its jurisdictional findings." (*In re I.C., supra,* 4 Cal.5th at p. 887.) He argues there were no physical findings that corroborated sexual abuse, and no family members or other individuals interviewed witnessed any inappropriate behavior. Carlos argues that R.V. was unreliable and confused about truth, and notes the California Supreme Court has held that statements from a child who cannot tell the truth from a lie may not be relied on exclusively unless the court finds that "'the time, content and circumstances of the statement provide sufficient indicia of reliability.'" (*In re Lucero L.* (2000) 22 Cal.4th 1227, 1248; see *id.* at p. 1246 [noting the "due process problem is compounded in the case of a child who has been determined to be incompetent to distinguish between truth and falsehood"].)

As the California Supreme Court in *In re I.C.* stated: "'[T]here are particular difficulties with proving child sexual abuse: the frequent lack of physical evidence, the limited verbal and cognitive abilities of child victims, the fact that children are often unable or unwilling to act as witnesses because of the intimidation of the courtroom setting and the reluctance to testify against their parents. [Citation.] Given these realities, the categorical exclusion of child hearsay . . . will often mean the exclusion of significant, reliable evidence required for the juvenile court to assert its jurisdiction over the child and to ultimately protect him or her from an abusive family relationship.'" (*In re I.C., supra,* 4 Cal.5th at p. 886; see *In re Cindy L., supra,*

19

17 Cal.4th at p. 29.)  For these reasons, "the traditional hearsay bar has been modified in the juvenile dependency context to allow courts to consider certain out-of-court statements concerning suspected abuse." (*In re I.C.,* at p. 884.)  In particular, section 355 "'broadly authorize[s] reliance on any hearsay contained in the social study by a child victim under the age of 12, as long as an objecting party does not prove that the statement was procured by means of fraud, deceit, or undue influence.'" (*In re I.C.*, at p. 885; see § 355, subd. (c)(1); *In re Cindy L.,* at p. 28, fn. 6.)  Section 355 also "makes clear" such hearsay statements "are sufficient to support a jurisdictional finding." (*In re Lucero L., supra,* 22 Cal.4th at p. 1242 (plur. opn. of Mosk, J.); see *id.* at p. 1245 [such statements "can serve as sole support for a jurisdictional finding"].)

In re I.C. involved an "unusual situation" where, shortly after a three-year-old child was abused by an older child, the three-year-old child made allegations against her father "strikingly similar" to the abuse incident involving the older child. (*In re I.C., supra,* 4 Cal.5th at p. 896.)  The three-year-old child "had a tendency to interweave fantasy with truth" and, during her forensic interview, made several demonstrably false statements after promising to tell the truth. (*Id.* at p. 894.)  The California Supreme Court held "a juvenile court may not base its findings solely on the hearsay statements of a truth-incompetent child—that is, a child who may not testify because she is too young to separate truth from falsehood—unless the child's statements bear 'special indicia of reliability.'" (*Id.* at p. 875.)  Citing the plurality opinion in *In re Lucero L., supra,* 22 Cal.4th 1227, the Supreme Court in *In re I.C.* stated that "'relying too heavily on the hearsay statements of incompetent minors to

20

make jurisdictional findings when there has been no opportunity for cross-examining the minor' [citation]—and, in particular, when the minor 'has been determined to be incompetent to distinguish between truth and falsehood' [citation]—raises a substantial risk of erroneously depriving parents of their substantial interest in maintaining custody of their children." (*In re I.C.,* at p. 887; see *In re Lucero L.,* at pp. 1244, 1246 (conc. opn. of Kennard, J.).)

Here, as stated, the juvenile court considered the *In re Cindy L.* factors in its analysis and credited R.V.'s statements. And in contrast to *In re I.C.*, "'the time, content and circumstances of the statement(s) provide sufficient indicia of reliability.'" (*In re Lucero L., supra,* 22 Cal.4th at p. 1248; see *id.* at p. 1246.) R.V. spontaneously disclosed her account of her abuse to a school staff member while going to the bathroom, repeated her account in substantially similar detail to additional school staff, police, and social workers, and spontaneously disclosed her account to Alexandra's sister-in-law. The juvenile court could reasonably believe R.V. was telling the truth. R.V.'s recounting of events reflected "spontaneity and consistent repetition," described specific sexual conduct "unexpected of a child of a similar age," and she had no discernable "motive to fabricate." (See *In re Cindy L, supra,* 17 Cal.4th at p. 30.)

Further, in this case, unlike *In re I.C.,* the juvenile court could also reasonably believe R.V. was capable of telling the truth from a lie. R.V. corrected the forensic interviewer, who asked if R.V. was 30 years old and then further asked "Did I make a mistake?"; R.V. replied, "Yep" and stated her correct age was four years old. R.V. also corrected the interviewer verbally and nonverbally during her account, including that Carlos covered

21

one of her legs, not both, with a blanket while licking her vagina. R.V. also stated the interviewer made a "mistake" in summarizing R.V.'s account as "I think I heard you say it hurt. . . . And then you ran?" R.V. had actually stated, "it hurt and then I pull and twist and then I run away from him. He was trying to catch me."

Additionally, the social workers who interviewed R.V. concluded that Carlos's conduct put her well-being and safety at risk. (See *Casey N. v. County of Orange* (2022) 86 Cal.App.5th 1158, 1176 ["[t]he importance of the social worker's reporting and recommendations in the dependency process cannot be overstated"; the court should "'give due consideration to the social worker's determination and the court may properly rely upon the agency's expertise for guidance'"]; *In re Brian W.* (1996) 48 Cal.App.4th 429, 433-434 ["The juvenile court may properly rely upon a social worker's report to support a jurisdictional finding under section 300 as long as the opportunity to cross-examine the social worker is provided."].)[5] We conclude substantial evidence supports the juvenile court's jurisdiction findings.

Substantial evidence also supported the court's finding that Alexandra's statements questioning R.V.'s account were not credible. When the conduct was first reported, Alexandra immediately said it could not be true and that R.V. was lying. Alexandra described four-year-old R.V. as a liar and "storyteller." R.V. stated she told Alexandra what happened. Alexandra attempted to shift the blame, suggesting perhaps R.V.'s "nino"

---

[5] The parties did not call any witnesses at the hearing, and Carlos does not argue he was deprived of the opportunity to call the social workers as witnesses.

was responsible for the abuse, but there is no evidence R.V. recanted her account or otherwise identified a different individual abusing her. And as the juvenile court noted, R.V. did not use the word "touch" in her accounts of what happened, except for Alexandra's statement that R.V. told her that her "nino" "touched" her vagina. Alexandra's statements do not affect the substantial evidence supporting the juvenile court's jurisdiction findings.

## DISPOSITION

The juvenile court's jurisdiction findings are affirmed. Carlos's appeal from the disposition order is dismissed.


MARTINEZ, P. J.

We concur:



SEGAL, J.



FEUER, J.